COURT OF APPEALS DIV
2013 OCT -7  AM 9: 08



# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

JEFFREY BEDE, as Personal )  NO. 68479-5-I
Representative of the Estate of )
LINDA SKINNER, Deceased, )  DIVISION ONE
)
               Respondent, )
)
        v. )
)
OVERLAKE HOSPITAL MEDICAL )  UNPUBLISHED OPINION
CENTER, a Washington corporation, )
and PUGET SOUND PHYSICIANS, )  FILED:  October 7, 2013
PLLC, a Washington corporation, )
)
               Appellants. )
_____ )

       LAU, J. — In this medical negligence lawsuit, Overlake Hospital Medical Center and Puget Sound Physicians challenge a judgment entered on a verdict for the Linda Skinner estate.  At issue are the trial court's rulings excluding autopsy photographs, allowing rebuttal, and disallowing surrebuttal expert witness evidence.  Because the exclusion ruling prompted no consideration of the Burnet[1] factors and the trial court acted well within its discretion to allow rebuttal and preclude surrebuttal evidence, we affirm the verdict.

_____
[1] Burnet v. Spokane Ambulance, 131 Wn.2d 484, 933 P.2d 1036 (1997).

FACTS

The Illness

Linda Skinner lived in Washington, D.C., for several years to help her son, Jeff Bede,[2] and his wife take care of their children. In 2006, she had surgery to remove a right acoustic neuroma.[3] Complications led to a second surgery to repair a spinal fluid leak into her ear.

In January 2010, Skinner moved from D.C. to Seattle to be closer to her family. Skinner flew from D.C. to Seattle on January 22. On January 24, Skinner complained to her son, Chris, and his wife about nausea, chills, a bad headache, and a sore neck. Skinner assumed she strained her neck while moving a mattress. The next day, Chris drove her to Overlake Hospital's emergency room (ER) when her symptoms did not improve. Emergency medical physician Marcus Trione examined Skinner. He testified that Skinner presented with symptoms consistent with an influenza-like illness and "very inconsistent with [bacterial] meningitis."[4] He discharged Skinner with a diagnosis of a flu-like illness, cervical strain, and nausea. Dr. Trione considered the possibility of meningitis, but his physical examination revealed no "nuchal rigidity."[5]

---

[2] We use family first names for clarity.

[3] An acoustic neuroma is a "benign, slow growing tumor on the nerve which connects the ear to the brain." Def. Ex. 147.

[4] Meningitis is "[i]nflammation of the membranes lining the brain and the spinal cord." Def. Ex. 147.

[5] "Nuchal rigidity," meaning the patient's neck is so stiff and painful that she cannot touch her chin to her chest, is one of three "classic" symptoms of meningitis. The other two symptoms in this "classic triad" are fever and altered mental status. Headache is also a symptom of meningitis in conjunction with the classic triad.

The next morning, on January 26, Chris drove Skinner back to Overlake's ER. Nurse Emily Larkin triaged Skinner when she arrived. Skinner was vomiting and reported her pain as a "10" on a scale of 1 to 10. She complained of severe neck and head pain and could not touch her chin to her chest. ER physician Laurie Anderton checked on Skinner several times over the course of six hours. Skinner complained of vomiting, respiratory infection symptoms, and neck stiffness. Dr. Anderton testified that an ER doctor considers meningitis if a patient presents with a headache, neck pain, and fever. Skinner was vomiting and "very uncomfortable" when Dr. Anderton first saw her. Report of Proceedings (RP) (Dec. 27, 2011) at 997. Skinner described increased neck pain into her head and down her back. Dr. Anderton's examination of Skinner's neck revealed muscle spasms, but no nuchal rigidity. Skinner's blood test indicated a highly elevated white blood cell count with a "left shift," meaning her neutrophil count was also elevated.[6] These symptoms prompted Dr. Anderton's concern about bacterial infection. She ordered an MRI (magnetic resonance imaging).

Radiologist Mark Zobel reviewed the MRI results and prepared a report. RP (Dec. 22, 2011) at 936. The report indicated "there is prominent enhancement of the meninges in the posterior fossa and in the cervical canal. This can be a finding of meningitis." Dr. Zobel's report recommended "lumbar puncture if not already

---

[6] A white blood cell count is a frequently ordered test that can indicate viral or bacterial infection. The "normal" range is 10,000 or less. Skinner's test results indicated her white blood cell count was over 19,000.

performed" to exclude meningitis but noted that this particular MRI result can also be caused by previous lumbar puncture.[7] RP (Dec. 22, 2011) at 937-43.

After considering the MRI results and the lumbar puncture recommendation, Dr. Anderton remained concerned about meningitis. According to Dr. Anderton, at that time Skinner was "looking dramatically better." RP (Dec. 27, 2011) at 1014. Skinner said her neck felt better and it was just a neck strain. Dr. Anderton determined that Skinner presented with no headache, no nuchal rigidity, no documented fever, no vomiting, and appeared lucid. Skinner also mentioned a prior unrelated lumbar puncture. Dr. Anderton ruled out bacterial meningitis and ordered no lumbar puncture. She discharged Skinner that afternoon with a diagnosis of neck pain, dehydration, and vomiting, and prescriptions for pain medication and antinausea medication.

Later that evening, Skinner became disoriented so Chris drove her back to Overlake's ER. There, she suffered a seizure and fell into a coma. A lumbar puncture showed "purulent fluid,"[8] and she was admitted to the intensive care unit for "acute Streptococcus pneumoniae meningitis." Attending physician William Watts wrote a detailed report about Skinner's two January 26, 2010 visits to Overlake. Regarding Skinner's prior 2006 surgery, Dr. Watts wrote, "The patient had a meningioma resected about 1-1/2 years ago. Head CT [computed tomography]scan on this admission suggests a communication between the mastoid cells and the subarachnoid space. This may have been through the previous acoustic neuroma resection site." Dr. Watts

---

[7] A lumbar puncture, or spinal tap, is the definitive test for bacterial meningitis. It involves the placement of a needle between the vertebrae in the spine to collect spinal fluid for tests.

[8] "Purulent" means "containing pus."

diagnosed Skinner with "[a]cute bacterial meningitis, due to Streptococcus pneumoniae." She died on January 27. Overlake's "Death Summary" report listed the cause of death as "acute bacterial meningitis."

The Overlake autopsy report listed the cause of death as "acute bacterial meningitis." The report also indicated presence of "purulent collection, right temporal, right inner ear." The report also described Skinner's prior surgery, noting, "The scalp and skull are status post left ventriculo-peritoneal shunt and right excision for acoustic nerve neuroma. . . . Purulent exudates, bilateral and patchy, is present in the subarachnoid space." The report noted a "collection of pus" that obscured the view of structures underlying the right temporal bone. A subsequent brain autopsy at Johns Hopkins confirmed "[a]cute bacterial meningitis" as the cause of Skinner's death.

The Lawsuit

Jeff Bede, as personal representative of Skinner's estate, filed a medical negligence suit against Overlake and Dr. Anderton's employer, Puget Sound Physicians PLLC ("PSP"), in July 2010.[9] A King County Superior Court case schedule order set an October 31, 2011 discovery deadline, a November 28, 2011 disclosure deadline for trial exhibits and witnesses, and a December 19, 2011 trial date. In July 2010, PSP propounded its first interrogatories and requests for production to the Estate, requesting "complete copies of any autopsy report, concerning any autopsy performed on Linda Skinner, and all supporting documents, including any report of chemical analysis, reports of microscopic slides, or other reports prepared concerning the autopsy."

---

[9] The Estate ultimately decided not to pursue negligence claims against Dr. Trione. We refer to Overlake and PSP collectively as "PSP" or "defendants."

PSP also propounded its first interrogatories and requests for production to Overlake, requesting "a copy of the complete medical chart of Linda Skinner from [Overlake], including all records, whether handwritten or typed, correspondence, imaging, and reports of any kind." In August 2010, the Estate propounded its first interrogatories and requests for production to Overlake and requested "the complete medical chart of patient Linda Skinner, including all records, whether handwritten or typed, correspondence, imaging, nursing notes and reports of any kind."

Later in August, Overlake responded to PSP's first set of interrogatories and requests for production by attaching Skinner's medical records. No autopsy report and no autopsy photographs were provided. The Estate responded to PSP's request with a copy of the Overlake autopsy report that indicated photographs had been taken, but the report included no photographs. Overlake responded to the Estate's first set of interrogatories and requests for production by indicating, "See documents previously produced in response to co-defendant's discovery request." Then, Overlake provided both the Estate and PSP with the "electronic record of the emergency room visits [which] were inadvertently left out of our previous production of the Overlake chart." Overlake provided no autopsy report or autopsy photographs.

In October 2010, Overlake sent PSP copies of the final autopsy report and Skinner's death certificate. It provided no autopsy photographs. In November, PSP sent Overlake a second request for production. This document requested "a color copy of the photographs referenced in the autopsy report completed by Overlake regarding Ms. Linda Skinner" and "two sets of pathology slides for the pathology

specimens related to the autopsy completed by Overlake . . . regarding Ms. Linda Skinner." For unknown reasons, Overlake failed to produce the photographs.

Over a year later, on December 9, 2011, the court granted a defense motion in limine to exclude any not previously disclosed evidence. A week later, PSP again requested the photographs from Overlake. Overlake provided the photographs to all parties the next day. This disclosure occurred nearly two months after the October 31, 2011 discovery deadline. The court excluded the photographs under King County Local Rule (KCLR) 4(j) and denied several subsequent defense motions for reconsideration.

### Estate Expert Witnesses

#### Infectious Disease Physician Martin Siegel

Dr. Siegel testified that at least 95 percent of meningitis patients suffer at least two of four symptoms, including headache, fever, stiff neck, and altered mental status. He testified that Dr. Anderton failed to meet the standard of care for an ER physician when she treated Skinner on January 26. He based this opinion on Skinner's severe headache, neck pain, history of fever that could be suppressed due to Skinner's use of pain medications, a very high white blood cell count, and MRI results consistent with meningitis. Based on these symptoms, Dr. Siegel opined that Skinner had meningitis when she arrived at the hospital the second time. Dr. Siegel testified that the standard of care for an emergency room physician required Dr. Anderton to perform a lumbar puncture within two hours of Skinner's arrival at the ER (and if not then, immediately after receiving the MRI results) and to immediately order a course of steroids and antibiotics. Dr. Siegel opined that Skinner would have survived had Dr. Anderton met this standard of care.

Dr. Siegel testified to three possible sources of Skinner's infection. He agreed with Dr. John Loeser that her infection likely started in the right ear at her previous surgical site.[10] He testified, "An abscess is a collection of white cells, which we call 'pus,' inside of an encapsulated - - it's encapsulated so it cannot actually expand out of there until the pressure is so great, and it will." RP (Dec. 21, 2011) at 561. Dr. Siegel testified that no evidence indicated Skinner had a "brain abscess" or a "mass in the brain." RP (Dec. 21, 2011) at 561-62. He stated that Skinner suffered "a collection of white cells and protein that formed as a result of no treatment for her progressive bacterial meningitis and ventriculitis." RP (Dec. 21, 2011) at 588. When asked on direct whether there was some sort of "rupture" that happened (a reference to Dr. Francis Riedo's testimony), he responded, "I'm not sure what a, quote, 'rupture' actually means."[11] RP (Dec. 21, 2011) at 562.

### Infectious Disease and Emergency Medicine Physician David Talan

Dr. Talan testified that Dr. Anderton violated the standard of care when Skinner arrived at Overlake on the morning of January 26. Dr. Talan opined on the cause of Skinner's meningitis, explaining that Skinner developed a leak in the seal at her prior surgical site, brought on by changes in the barometric pressure during her flight to Seattle. Dr. Talan testified that he was uncertain whether Skinner had meningitis when

---

[10] Dr. Siegel stated, "In this patient, after reading some of the testimony of Dr. Loeser, I would agree with him that this most likely started in her right ear from - - in the postoperative site, and in some way then connected into the - - contaminated the spinal fluid." RP (Dec. 21, 2011) at 556. In response to cross-examination, he readily agreed that he had changed his earlier opinion on the likely source of the infection.

[11] Indeed, no one ever asked Dr. Riedo what he meant when he used the term "rupture."

-8-

she arrived at the ER on January 25, but based on her symptoms, she definitely had it on the 26th. Regarding whether the pneumococcus bacteria caused an abscess, Dr. Talan stated, "You'll hear some talk about, you know, whether there was a brain abscess. . . . It's not a cause of - - it's not a common cause of a brain abscess, so that weighs into my opinion." RP (Dec. 22, 2011) at 766. Dr. Talan testified that the standard of care for a patient presenting with Skinner's symptoms on the morning of January 26 required that meningitis be excluded as a cause. Thus, Dr. Anderton had a duty to perform a lumbar puncture and either exclude or identify bacterial meningitis, regardless of whether the patient had a prior lumbar puncture. Dr. Talan also testified that the standard of care required Dr. Anderton to treat with antibiotics, certainly after the MRI results. Dr. Talan opined that Skinner would have survived if she had received antibiotics by noon on January 26.

Dr. Talan testified that Skinner may have had "a collection of fluid containing pus and bacteria" in her old acoustic neuroma surgery site or merely "a fluid collection that was colonized with pneumococcal bacteria." RP (Dec. 22, 2011) at 811. He stated that the area definitely contained bacteria, but "it may not have represented true pus in a primary site of infection. It may only have represented a fluid collection that was colonized with the normal bacteria." RP (Dec. 22, 2011) at 821. He believed the cause of her meningitis was "entry of bacteria from the outside colonizing, or infecting, that area into the brain" due to the defect in the area resulting from her old surgery. He later confirmed during jury questions that the bacteria that entered Skinner's brain came from the old acoustic neuroma surgical site. But he also testified that Skinner "did not have an abscess. She did not have an abscess that led to her meningitis." He noted that the

autopsy reported no abscess but said there was "a glob of debris or some abnormal finding on the CT scan." RP (Dec. 22, 2011) at 799. Having given his opinion that no abscess was present behind Skinner's right ear, Dr. Talan also stated Skinner had no abscess in her left ventricle:

> A. So in the records later, the radiologist reads some debris, and remember the - - I wish I had a picture, but the ventricles are sort of - - communicate with the spinal fluid. They're these dark areas you see usually on the CT scan . . . and in one of those big ventricles, there's some sort of white stuff.
>
> . . . .
> . . . [A]nd then there was another [CT scan] done, and then it moves from, like the front of that ventricle towards the back, towards the back of the head.
> Q. And to a reasonable degree of medical probability, is that an abscess?
> A. No, it's not an abscess. An abscess is pus surrounded by tissue, so, first of all, that would not be an abscess. And then I guess the idea that I've heard is that: Well, this big glob of - - maybe it's pus - - was the result of an abscess opening up.
> I've thought about that, and that is also impossible, because the ear problem was on the right and this - - this abnormal material was on the left, and it's big. . . . The opening between the right and left side of the brain isn't - - would not even allow that.
> So I can't connect anything about that, other than it is probably debris and tissue damage as a result of untreated meningitis. . . . [F]or all those reasons it cannot be an abscess.

RP (Dec. 22, 2011) at 800-01.

### Defense Expert Witnesses

### Emergency Medicine Physician Ronald Dobson

Dr. Dobson defined "abscess" as "a localized collection of bacteria and pus in any part of the body. Pus is the collection of fluid and dead blood cells that are used to fight infection that are present." RP (Dec. 28, 2011) at 1273. He said that "usually an abscess will have not only just a localized collection of fluid and infected material, it will actually have a surrounding area that's inflamed and swollen as well." RP (Dec. 28,

-10-

2011) at 1273. However, he later clarified, "Depending upon what area of the body you're in, you may not have a membrane or something around the collection of pus, but it is a definite area that you can see." RP (Dec. 28, 2011) at 1377. He testified that he believed Dr. Anderton met the standard of care on January 26 given the improvement in Skinner's symptoms while she was observing her. He testified that Skinner's prior lumbar puncture was a reasonable explanation for the MRI results.

### Neurosurgeon Richard Wohns

Defense expert Dr. Wohns testified that Skinner had a "clinically indolent"[12] infection in the old surgical site that allowed eventual infection into the central nervous system. But Dr. Wohns could not pinpoint how long the infection had been present. See RP (Dec. 28, 2011) at 2091; RP (Dec. 29, 2011) at 2110, 2111-18 (Dr. Wohns opined that Skinner died from "pyogenic ventriculitis" that moved so "very quickly, 12- to 36-hour range, somewhere in there, 24 plus or minus 12," that she would have died even if she had received earlier antibiotics and steroids; that Skinner developed an infection including "white blood cells, bacteria and possibly pus" in the area of her old surgical site; that changing pressure on the airline flight caused infectious material to spread into the spinal fluid space; and that this infection spread into the ventricles). Dr. Wohns defined "abscess" as "[a] loculated, contained area of pus that's usually encapsulated in some way." RP (Dec. 28, 2011) at 2097. On direct-examination, PSP's counsel asked him, "Did something happen which caused this collection of

---

[12] Dr. Wohns defined "clinically indolent" as "an infection which is indolent is one that is not acute, that could be, quote/unquote, simmering along for a while in the subclinical phase of not being a true abscess and not causing major classic signs and symptoms of - - of an abscess or a major infection." RP (Dec. 29, 2011) at 2110.

-11-

infection to rupture or break open and leak into the brain?" RP (Dec. 29, 2011) at 2110-11. Dr. Wohns answered "Yes" and used illustrative exhibit 138A, published to the jury, to explain how the infection got into Skinner's brain. This exhibit depicted infected ventricles and contained the preprinted statements, "Infection burst, spreading infection into subarachnoid space. The infection spread into ventricles (as seen on CT)." Pltf. Ex. 138A.

### Neuroradiologist Kenneth Maravilla

Dr. Maravilla testified that there was a collection of fluid, bacteria, and pus in Skinner's old surgical site at the back of her right ear. Dr. Maravilla testified that this was "an abscess or abscesslike collection" in that it was "basically a collection of pus that's walled off with a capsule of usually reactive fibrous tissue and reactive inflammatory tissue." RP (Dec. 27, 2011) at 1128. He later clarified his use of the term "abscesslike":

> I'm using kind of ear infection, quote/unquote, and abscesslike collection - - basically to me they're synonymous. So what I'm saying is there's an infection. And it's a little bit - - part of [it is] semantics.
> . . . .
> And the collection - - I mean, it's an infected collection. If you don't like the term abscesslike, that's fine with me. The fact is that it's still an infected collection with bacteria and material and showing communication with the outside from the gas bubbles and possibly also containing gas-forming of bacteria organisms.

RP (Dec. 27, 2011) at 1174-75. On redirect, PSP's counsel asked Dr. Maravilla to expand on this topic:

> Q. And, Dr. Maravilla, does it matter if we refer to this as abscess-like, as a purulent collection, as a collection of pus and bacteria or as a walled-off collection of pus and bacteria.
> A. Well, as I indicated yesterday, no, it doesn't. If there's an objection to using the term pus, abscess-like, that's fine with me.

-12-

> What I was trying to convey is that there's a collection of infection, infectious material in the ear, and that the communication - - the potential communication with the ear had already been established from the previous surgery, and had already broken down previously and been repaired, and with the infection probably caused the repair to break down again and leak into the subarachnoid space and cause the meningeal infection.
>
> Q. And whether people call this a purulent collection or a collection of pus and bacteria or a walled-off collection or an abscess-like collection, are they all referring to the same thing?
>
> A. Yes. It's purely semantic. I mean, we're all talking synonyms here in any opinion.

RP (Dec. 28, 2011) at 1227-28. Responding to jury questions, Dr. Maravilla repeated, "I don't think it's important to describe it as abscess, abscess-like. The important thing I was trying to convey is that there's an infection in the ear that was the potential source, or the way the infection got into the brain is at the head." RP (Dec. 28, 2011) at 1234.

Dr. Maravilla testified:

> [M]ost likely the cause for [Skinner's] infection is the fact that she had this infection in her ear and then took the plane trip [to Seattle].
>     . . . . [A]nd as the pressure built up on descending altitude, it kind of pushed things . . . . And so this allowed the material to kind of leak into the inner - - inner part of the skull."

RP (Dec. 27, 2011) at 1137-38. The bacteria and pus, having gained access to the spinal fluid through the defect in the old surgical site, then infected the meninges of the brain. Dr. Maravilla characterized the leak as a "slow leak." RP (Dec. 28, 2011) at 1224. He testified that he believed Skinner had meningitis on the morning of January 26 when she underwent the MRI. He believed Skinner had contracted meningitis and ventriculitis 24 to 48 hours before undergoing her first CT scan on the evening of January 26 because "it would take at least that long for the pattern that we were seeing in the ventricles and CSF [cerebrospinal fluid] spaces to evolve to that point," meaning her time of onset would be sometime between January 24 and January 25. RP (Dec.

28, 2011) at 1224, 1241. Dr. Maravilla acknowledged he saw no abscess in Skinner's

brain itself or in the ventricles on her CT scans. He also stated that he did not believe

Skinner's illness involved a "rupture:"

> I think what happens is that as the pressures change you get a little leakage and it - - kind of more of an oozy type of passage from the inner ear infection into the subarachnoid space through this potential communication that had been repaired previously but probably was weakened by the infection and is starting to break down again. The pressure change caused it to - - more like a toothpaste tube or something - - ooze a little bit of infection, and then that sets up this whole cascade of events where bacteria multiply and infection spreads, forces going to the ventricles, and you get the full blown picture of meningitis and ventriculitis.

RP (Dec. 27, 2011) at 1178. He later added, "[T]his was a slow progressive process,

that the bacteria were introduced by more of an oozing like a toothpaste-like shift from

the ear into the intercranial space. And then from there it just multiplied and spread

around the subarachnoid space, around the CSF spaces that surround the brain."

RP (Dec. 28, 2011) at 1239. He stated, "I think this whole process evolved over a

period of days. It didn't involve a rupture." RP (Dec. 28, 2011) at 1239.

### Infectious Disease Physician Francis Riedo

Dr. Riedo testified that Skinner "clearly had an abscess in the surgical site where

the acoustic neuroma had been removed, and I think that abscess produced a lot of her

neck pain, neck spasm symptoms." RP (Dec. 29, 2011) at 1420. Dr. Riedo defined

"abscess" as "a collection of bacteria and the inflammatory response to those medias,

so basically white blood cells that is contained" or "a collection of bacteria and pus in a

closed space." RP (Dec. 29, 2011) at 1422, 1485. He testified that Skinner had a

"contained collection of bacteria and white cells surrounding that." RP (Dec. 29, 2011)

at 1422. He testified that all the experts agreed with the working definition of

-14-

"abscess"—"many of them felt that there was a contained collection of pus and bacteria, which by definition is an abscess." RP (Dec. 29, 2011) at 1451. He stated that the collection was located in the cavity created by the acoustic neuroma surgery, and it was "contained by the dura, by the outside tissue that closed over the tympanic membrane, and by the patch material that was introduced at the time of [Skinner's] second surgery to close off the spinal fluid leak." RP (Dec. 29, 2011) at 1423. Dr. Riedo testified that at some point the abscess reached a critical mass, and it "perforated into the brain" through the old surgical repair site. RP (Dec. 29, 2011) at 1421. He testified there was a "rapid release of a purulent broth of bacteria and a lot of white cells that led to her symptoms." RP (Dec. 29, 2011) at 1421. According to Dr. Riedo, the most likely explanation for Skinner's progression of symptoms was "a rupture of the abscess into the brain." RP (Dec. 29, 2011) at 1421.

When asked, "which explanation do you think is more likely in this, that the meningitis had been going on for a long time, or that there was a rupture of an abscess-like collection going directly into the brain?" Dr. Riedo answered, "I think the latter is far more likely." RP (Dec. 29, 2011) at 1435. He testified that this likely occurred during Skinner's second visit to the ER (the morning of January 26) and that this explained the temporary relief in Skinner's symptoms at that time. Thus, "that rupture allowed decompression, relief of symptoms only to be followed by her catastrophic deterioration." RP (Dec. 29, 2011) at 1429.

Dr. Riedo characterized Skinner's condition as "instant meningitis" caused by the rupture of the "preformed pocket of pus." RP (Dec. 29, 2011) at 1436. He opined that Skinner would not have survived even if Dr. Anderton had prescribed antibiotics by

noon on January 26. Dr. Riedo agreed with Dr. Maravilla's opinion that the original source of Skinner's infection was an "abscess-like collection of pus and bacteria in the old acoustic neuroma surgical site." RP (Dec. 29, 2011) at 1473-74. When asked why the autopsy report mentioned a collection of pus and bacteria rather than an abscess, Dr. Riedo stated, "What did they call it? A collection of purulent material, potato, 'potato.' It is - - an abscess is by definition a collection of pus in a confined space." RP (Dec. 29, 2011) at 1480. He stated, "I think the two terms can be used synonymously. I mean, a collection of pus in a closed space is by definition an abscess." RP (Dec. 29, 2011) at 1486-87. He described, "[Skinner is] really acting much more like a ruptured abscess, which is a very prominent or rapidly progressive process that has - - that [led] to her catastrophic decline." RP (Dec. 29, 2011) at 1470. Dr. Riedo framed the medical causation question: "I think Ms. Skinner obviously did have bacterial meningitis. The question was how did the bacteria get into her brain?" RP (Dec. 29, 2011) at 1470.

Rebuttal Witness Neurosurgeon John Loeser

Over defense objection the court permitted Dr. Loeser to testify on rebuttal in response to Dr. Riedo's testimony.[13] Dr. Loeser stated that Dr. Anderton failed to meet

---

[13] Dr. Loeser submitted to two depositions before trial. At his first deposition in November 2011, Dr. Loeser testified that gas and fluid built up in the middle ear region where Skinner's surgical repair site was located. He thought this repair site was the site of the initial infection. He suspected "more likely than not the cause of [Skinner's] meningitis was the spinal fluid leak that occurred relevant to the pressure changes, and that . . . bacteria from the ear entered the subarachnoid space subsequent to that." He thought the "beginning of [Skinner's] meningitis occurred around the time of her flight, and when the old repair site opened up and the bacteria got into the subarachnoid fluid."

At his second deposition in December 2011, Dr. Loeser added that he did not agree with the theory that an infection catastrophically ruptured into the subarachnoid

the standard of care. He testified that Dr. Anderton should have performed a lumbar puncture based on Skinner's history of fever, neck pain, and headache; history of nausea and vomiting; her white blood cell count; and the MRI results.

Dr. Loeser disagreed with Dr. Riedo's testimony that Skinner had some sort of abscess that ruptured when she was in the ER on January 26. Dr. Loeser defined "abscess" as "a collection of dead white cells - - pus - - surrounded by the body's attempt to isolate that infection, which we call a 'capsule.'" RP (Jan. 3, 2012) at 1669. He said Skinner's "infection was occurring in a space that was already created by the [prior acoustic neuroma] surgeons. If you want to argue she had an infection there, it's an empyema. It's not an abscess." RP (Jan. 3, 2012) at 1670. Dr. Loeser later clarified that an empyema is an infection in a previously existing space. He said the most likely cause of Skinner's meningitis was "a leak from the empyema in the ear that contaminated the subspinal fluid spaces." RP (Jan. 3, 2012) at 1671. Dr. Loeser questioned the autopsy report's conclusion that there was purulent material in the middle ear, opining, "The debris seen in that space could be the remnants of the fat graft, and the collagen and the Dura[G]en, and things that were packed in there." RP (Jan. 3, 2012) at 1671. But on cross examination, he agreed that "purulent" meant "containing pus" and agreed that the purulent collection in Skinner's ear was contained for a period of time in the space left behind by Skinner's prior surgery before it began to

---

space. He clarified that his best explanation for Skinner's illness was a "smoldering infection in her middle ear which probably, due to pressure changes that occurred with her air travel, leaked into the subarachnoid space . . . ." Dr. Loeser "[saw] no evidence that [Skinner] had an abscess, meaning an infection surrounded by an inflammatory capsule that contained purulent material."

-17-

leak out. He also stated he had no way of disagreeing with the pathologist's description of the purulent collection.

When confronted with his deposition testimony, Dr. Loeser stood by his statement that the old repair site ruptured or broke open due to pressure changes during Skinner's airline flight. Dr. Loeser agreed that pus was contained or held in the old repair site by bone.

Opening and Closing Statements

In opening remarks, PSP's counsel outlined the evidence supporting its mechanism of infection theory at trial:

> [Skinner] had an abscess-like collection of pus and bacteria between her inner ear, way back . . . and next to the brain. That was related to two old surgeries that she'd had.
> . . . [S]he began to have bacteria in that old surgical site and a smoldering type of infection. This abscess-like collection of pus and bacteria, then, close to the brain began to leak some into the cerebrospinal fluid. . . .
> But then this abscess-like collection of pus and bacteria here by the brain ruptured, and it was a catastrophic rupture. This big collection of bacteria and pus burst into the brain and into the fluid covering the brain. . . .
> . . . As a result, Ms. Skinner did develop bacterial meningitis. . . . [And] a highly fatal condition called "pyogenic ventriculitis" . . . .
> So she had two very, very and highly fatal conditions, rupture of this brain abscess or abscess-like collection of pus and bacteria, and the pyogenic ventriculitis.

RP (Dec. 20, 2011) at 352-53. This mechanism of infection theory remained the same in PSP's closing remarks. In summarizing the evidence, counsel argued in part:

> [T]he evidence is pretty clear that Ms. Skinner developed atypical meningitis, and she also had pyogenic ventriculitis. It came from that localized collection of pus and bacteria at the old surgical site.
> So now here we [go] to the famous word "abscess," all the debate. Dr. Riedo says this was an abscess because it was contained by bone and fibrous tissue. Other people said it's a collection of bacteria and pus. And just yesterday we heard from Dr. Loeser. He said no, you shouldn't call it an abscess, you should call it an empyema, which means a collection of bacteria

-18-

and pus and fluid. [Dr. Riedo] said, you know, this is all kind of semantics, potato/potahto, we're all talking about the same thing. And it was this bad same thing that caused this atypical meningitis and then the ventriculitis, the pus and bacteria in the brain.

RP (Jan. 4, 2012) at 1959. Counsel continued:

[Dr. Riedo] said the pus collection broke open in part from pressure from the flight but also because of inflammation and then because of the every [sic] increasing multiplication of larger and larger amounts of bacteria and pus.
Ms. Skinner had catastrophic meningitis and ventriculitis because huge numbers of the bacteria in that collection spill out into the brain all at . . . about the same time . . . .

RP (Jan. 4, 2012) at 1979.

The jury found Dr. Anderton negligent and the negligence proximately caused Skinner's death. It awarded $3 million in damages against Overlake and PSP. The court entered judgment on the jury's verdict.

Overlake and PSP moved for a new trial, arguing that (1) the trial court improperly allowed the Estate to present rebuttal testimony from Dr. Loeser and precluded surrebuttal to that testimony and (2) the trial court improperly excluded Skinner's autopsy photographs. The court denied the motion. The court also denied PSP's subsequent "supplemental" motion for new trial. PSP and Overlake appeal.

ANALYSIS

Standard of Review

Decisions whether to exclude evidence, either as a sanction or on substantive grounds, are reviewed for abuse of discretion. Burnet v. Spokane Ambulance, 131 Wn.2d 484, 494, 933 P.2d 1036 (1997). Trial courts have broad discretion regarding the choice of sanctions for violation of a discovery order. Burnet, 131 Wn.2d at 494. "Such a 'discretionary determination should not be disturbed on appeal except on a

clear showing of abuse of discretion, that is, discretion manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons.'" Burnet, 131 Wn.2d at 494 (quoting Associated Mortgage Investors v. G.P. Kent Constr. Co., 15 Wn. App. 223, 229, 548 P.2d 558 (1976)).

Decisions regarding rebuttal and surrebuttal testimony are also reviewed for abuse of discretion. State v. White, 74 Wn.2d 386, 394-95, 444 P.2d 661 (1968).

### Autopsy Photographs

#### Relevant Facts

As discussed above, it is undisputed that Skinner's autopsy photographs were not provided to all parties until December 16, 2011—the Friday before the start of trial. On the first day of trial, December 19, the Estate moved to strike the autopsy photographs. The Estate argued that the "quite gruesome" photographs were produced after the discovery deadline despite both the Estate's and PSP's requests for all information related to Skinner's healthcare. RP (Dec. 19, 2011) at 12. The Estate claimed that allowing the photographs would violate the court's order in limine and prejudice the Estate:

> Your Honor granted a motion in limine brought by Overlake that any information that had not been produced as it should have been produced in discovery was excluded from this trial. It's motion in limine number twelve. I now believe that the defendants want to violate that motion in limine, and I want to raise this issue with Your Honor.
>
> . . . .
>
> I think this would violate the motions in limine. . . . These [photographs] were produced extremely late. It's too late to deal with these and to find out the meaning of them and whatnot. And I think it would be prejudicial to the plaintiffs, and I think it would violate Your Honor's order in limine.

RP (Dec. 19, 2011) at 11-12. PSP's counsel responded that it had no need for the photographs "until December 8 when the plaintiffs obtained a ruling from Your Honor that they could call Dr. Siegel then on standard of care rather than the expert they had been using which was Dr. Richard Cummins."[14] RP (Dec. 19, 2011) at 12. Counsel specifically argued:

> Dr. Cummins testified that Ms. Skinner had a brain abscess and that the brain abscess was in the old surgical site, a surgery she'd had back in 2006, and that this abscess broke - - ruptured open and spilled the pus and bacteria into the brain and that's how this infection got started. So I - - That's what my experts say too. So I'm fine with that. Well, then all of a sudden on December 8 there's no more Dr. Cummins and now there's Dr. Siegel. And Dr. Siegel testifies that well, I don't really know where this infection came from, I mean maybe from here maybe, but it could have come from just some other part of her body or maybe sinuses or whatnot.

RP (Dec. 19, 2011) at 13.[15]

---

[14] The Estate had originally disclosed Dr. Richard Cummins as an expert witness. Dr. Cummins agreed at his deposition that Skinner "may well have had bacteria in [the acoustic neuroma] surgical site for a period of time before she actually became symptomatic." When asked whether Skinner had an abscess in the old surgical site, Dr. Cummins replied, "You know, I'm not an expert on that. . . . All I can comment on is what was found during these several days there, and certainly it would be consistent with an abscess." He agreed that the early CT scans showed what could have been "abscess, pus" in the old surgical site. Dr. Cummins stated that Skinner's symptoms at the ER could be explained by Skinner having a walled-off area of bacterial infection in the surgical site that ruptured or drained.

[15] The record shows that Dr. Cummins never testified that Skinner had a "brain abscess." This term was first introduced to the jury by PSP's counsel's opening statement summarized above. See RP (Dec. 20, 2011) at 353. In fact, when PSP asked Dr. Riedo, "[Y]ou're not saying that there was a brain abscess, are you?", Dr. Riedo answered, "No." RP (Dec. 29, 2011) at 1473. Read in context, it is questionable whether Dr. Cummins' deposition supported PSP's causation theory and whether he would have been competent to offer causation testimony. The Estate's counsel notified PSP's counsel that Dr. Cummins was "disclosed . . . to primarily testify about standard of care of Dr. Trione . . . and Dr. Anderton." Dr. Cummins disagreed with PSP's use of the term "rupture" and said if the abscess did rupture, it would not have temporarily relieved Skinner's pain. He stated, "The problem I'm having is with

The court asked whether any of PSP's experts had relied on the autopsy photographs in developing their opinions, to which counsel responded, "No, because they relied on the autopsy report, and they also had the testimony from Dr. Cummins." RP (Dec. 19, 2011) at 13. The court ruled, "I'm going to exclude autopsy photos produced for the first time on Friday afternoon the day before trial. . . . That's too late." RP (Dec. 19, 2011) at 13-14. Counsel for PSP responded, "All right."[16] RP (Dec. 19, 2011) at 14.

Later in the day, PSP moved for reconsideration, arguing for the first time that the photographs should not be stricken as a discovery sanction because the record provided no support for, nor did the court make, the requisite Burnet/Blair findings. PSP acknowledged that Blair focused on witness exclusion, but argued, "[T]here is no logical distinction between witness exclusion and document exclusion." PSP claimed that "use of the autopsy photos only became an issue on or after December 9, 2011, when plaintiff first advised the Court and defendants that he would not be calling Dr. Richard Cummins as an expert witness at trial." PSP claimed that only after

---

agreeing with just this term rupture." On causation, he qualified his responses by saying he was not an infectious disease expert and was not offered to give causation opinions. And he said he would have to give a speculative opinion about how long Skinner had bacteria in the old surgical site prior to January 25 when she first presented at Overlake. The Estate's counsel objected "because I think I've already notified you we're planning on using the infectious disease physician, Dr. Seagull [sic], to talk about what would have happened had Mrs. Skinner gotten antibiotics on the 25th and 26th, . . . what her likely outcome would have been." Dr. Siegel ultimately agreed with all the experts about where the infection came from as summarized above.

Dr. Cummins also testified at his deposition that Dr. Trione was negligent in initially evaluating Skinner. Because the Estate chose not to pursue a negligence action against Dr. Trione, it withdrew Dr. Cummins as a witness before trial.

[16] PSP made no offer of proof as to the autopsy photographs' relevance.

that time did it become clear that it would need to examine and rely on the photographs to "depict what Dr. Cummins would have conceded by testimony." Specifically, PSP claimed:

> In his deposition, Dr. Cummins agreed that Ms. Skinner suffered from an abscess (containing quantities of bacteria and pus) in an old surgical site. The abscess broke up, flowed into fluid surrounding the brain, resulting in a primary brain infection, meningitis, and ventriculitis. Both a brain abscess and ventriculitis are often fatal. . . .
> Defendants felt entitled to rely on Dr. Cummins' testimony, because it was consistent with their own theory of the case. Dr. Siegel, on the other hand, was unwilling to concede the point about the abscess. . . . and disputed the theory that Ms. Skinner's prior surgical site was the breeding ground for the infection that eventually caused her death. Instead, he suggested that it might have been one of at least three theories. . . .
> It was only when plaintiff pulled Dr. Cummins that defendants realized that plaintiff had changed his theory and was relying solely on Dr. Siegel's vague and ambiguous position regarding the multiple explanations of causation. They then realized that they would need to obtain what turned out to be the gruesome photos of Ms. Skinner's diseased brain, given the plaintiff's shift, effectively announced on December 9 and 13, 2011.

Both sides submitted briefs that discussed the discovery and other issues implicated by the autopsy photographs. In its opposition to reconsideration, the Estate claimed that the court properly enforced an agreed motion in limine and Burnet and Blair were inapplicable because those cases "involved decisions to exclude witnesses, not documents disclosed literally at the eleventh hour." The Estate also claimed the photographs were inadmissible under ER 403. The court denied reconsideration on December 20:

> I have read the memorandum in support of the motion for reconsideration, I have reviewed 16 autopsy photographs, and I have received this morning and reviewed plaintiff's memorandum in opposition to the motion for reconsideration.
> I am not going to reconsider my previous ruling to exclude the Overlake autopsy photographs, and let me articulate my analysis on this issue for the record.

These medical records were requested by the plaintiff during discovery. The photos were not produced during discovery. Although they were referenced in an autopsy report that was produced, it's not the plaintiff's burden to make sure that Overlake has produced all of the requested documents in its possession.

The defendants had a second opportunity to produce these and submit them under ER 904 - - they didn't do that - - and under King County Local Rule 4(j), the parties shall exchange no later than 21 days before the trial date a list of the witnesses that they intend to use and copies of all documentary exhibits, and they were not produced at that point, either.

Under 4(j), a witness or exhibit not listed may not be used at trial unless the court orders otherwise for good cause, so the question is, have the defendants shown good cause for not disclosing these autopsy photos before the Friday before trial, and I conclude they have not done so.

As I indicated, the photographs were within the exclusive control of Overlake throughout the pendency of this lawsuit, and Overlake and [PSP] had ample opportunity to review the photos to determine if they supported the defense theory of the case, and although the plaintiff had a copy of the autopsy report, as I indicated, it is not the plaintiff's responsibility to evaluate whether those photos support the defendants' theory of the case. That responsibility lies with the defendants.

I do not believe the defendants had a right to rely on the testimony of Dr. Cummins to prove their case. There is always a risk that a party will choose not to call a particular witness, including an expert witness, and each party is responsible for presenting their own evidence.

In addition . . . I have reviewed Dr. Maravilla's deposition that I have, Dr. Wohn's . . . and Dr. Riedo . . . and it appears that none of them actually saw these photos or relied on them in any way to develop their opinions. They thus don't appear to be crucial to the presentation of that expert testimony.

Third . . . I also believe defendants should have evaluated the significance of these autopsy photos before December 16, regardless of Dr. Cummins' testimony.

So I conclude that the defendants have not shown good cause for their failure to review the photos, to produce them before the discovery cutoff of October 31, to identify them in their ER 904 submittal, or to list them in their trial exhibit disclosure.

RP (Dec. 20, 2011) at 282-85 (emphasis added). The court also gave another basis for

its decision:

Now, in addition, I have evaluated these photographs under ER 403, and autopsy photographs can be admissible if they are accurate and if their probative value outweighs their prejudicial impact. There are many of these photographs

-24-

that I think the defendant itself conceded are gruesome, and I would agree with that. They're fairly gruesome.

And they have - - I'm going to assume they have some probative value. Looking at the photographs, I don't know what that is, because I don't know what the defense thinks they show, but I'll assume for the sake of argument that they have some probative value. But I do believe that the gruesomeness of the photos, particularly those showing the skull with the hair, are simply too inflammatory to be admissible under ER 403.

Now, the defendants are free to use a diagram, free to use an illustration, in order to support your defense experts' testimony, but I'm not going to allow the autopsy photographs.

RP (Dec. 20, 2011) at 285-86.[17] Counsel for PSP then made a brief statement regarding the photographs, claiming, "There's just a handful of those pictures that are crucial." RP (Dec. 20, 2011) at 288. Counsel stated, "I will tell the court now - - and we will add additional foundation at this point - - that these pictures are unique confirmation of the theory that Mrs. Skinner died because of the consequences of an abscess and it was not meningitis that killed her." RP (Dec. 20, 2011) at 288 (emphasis added). Counsel stated that the photographs "go directly and uniquely to the causation issue, and we'll provide additional foundation for that later on during the course of the trial, and promptly." RP (Dec. 20, 2011) at 288. Counsel reiterated that PSP did not believe the photographs were material "so long as the plaintiffs were pursuing a causation theory in which they were acknowledging an abscess." RP (Dec. 20, 2011) at 289. Counsel added:

[M]y client is being sanctioned because Overlake didn't produce the documents. I don't think that's fair, I don't think that's sustainable under Blair and Burnet, nor do I think a King County local rule can displace the obligations to facilitate the search for the truth that is mandated by the overall civil rules as explicated in Burnett and Blair."

---

[17] PSP made no offer of proof as to the relevance of the autopsy photographs to support its motion for reconsideration.

RP (Dec. 20, 2011) at 289.

On December 22, counsel for PSP indicated he was going to "follow up on the autopsy pictures issue." RP (Dec. 22, 2011) at 734. Counsel stated,

> When last we discussed that matter, you had expressed some concern that we were asking you to do something based on a brief asserting the relevance of the evidence and where was the proof, and I promised that we would address this with our experts.
> We are now in a position, shortly, by this afternoon, to provide you with a declaration on that point and a short supplemental discussion, and I will keep my oral presentations in this to an absolut[e] minimum.

RP (Dec. 22, 2011) at 734-35. That afternoon, PSP renewed its reconsideration motion and provided the court with a supplemental memorandum and a declaration from Dr. Riedo.[18] In the supplemental memorandum, PSP claimed that its "precise contention" was that Skinner had an "abscess-like formation that likely ruptured, which explained why Ms. Skinner felt a relief from pressure and pain and then experienced a very rapid deterioration and rapid demise . . . ." It claimed that "no more than six of the 17 photos are necessary" and offered to "make an offer of proof, relying upon Dr. Riedo's testimony, regarding the relevance of the selected photographs (no more than six out of seventeen), and what is depicted in each and why it matters." In his declaration, Dr. Riedo testified that he had not relied on the photographs in forming his opinions, but he believed that by withdrawing Dr. Cummins as a witness, the Estate was changing its theory of the case and disputing what Dr. Riedo thought was the cause of Skinner's death—"the rupture of the infected abscess-like formation." Dr. Riedo stated that the photographs were "corroborative of the presence of what was a large pocket – what I refer to as abscess-like formation – and that [Skinner's] clinical experience (i.e.,

---

[18] This was defendants' first offer of proof on the relevance of the photographs.

her apparent sense of relief from pain and discomfort followed by a very rapid deterioration and death) is corroborative of that abscess-like formation having ruptured." Dr. Riedo indicated that "perhaps four to six" of the photographs were essential, but he failed to identify which particular photographs those were, nor did he specifically explain how particular photographs aided the defense's theory of the case.

The same day, during Dr. Talan's testimony, a juror asked, "Would pus, if present in the ventricles, appear in an autopsy of the brain?" RP (Dec. 22, 2011) at 909-10. Dr. Talan replied:

> It should appear, but autopsies sort of depend on how much you look, and where you look. So, right, where was it on the autopsy? I don't think it was described.
> Or maybe it was. Maybe that's what the ventriculitis referred to. But I didn't see that the thing that we saw on the CT scan was, you know, described, its dimensions, like we'd refer to on the autopsy.
> So they may not have looked at it. It may have gotten lost, because when you open up tissues, things spill out. . . . And so it's - - if they went in looking for it, they might have been able to find it if it was there.

RP (Dec. 22, 2011) at 910. In a follow-up question, counsel for PSP asked Dr. Talan, "Would photos done at an autopsy assist you in determining that question?" RP (Dec. 22, 2011) at 910. Dr. Talan responded, "Possibly," but said he did not look at any photographs in reviewing Skinner's case. RP (Dec. 22, 2011) at 910.

At the conclusion of Dr. Talan's testimony, the Estate's counsel expressed concern about the above question:

> I would like to put on the record that I think that the fact that your Honor excluded the autopsy photos on the basis of a discovery violation and then counsel is not cross-examining the witness, I think that's a direct violation of the court's ruling.
> The ruling of the court was that the autopsy photos were not going to be discussed during the trial because of a discovery violation and I think that question violated the court's order.

RP (Dec. 22, 2011) at 927. The court reviewed its prior ruling and noted that it had not specifically addressed the issue of making reference to the existence of the photographs, but had "assumed, as a matter of motion in limine 101, if you exclude a document, you can't make reference to it." RP (Dec. 22, 2011) at 928. The court noted its displeasure but reserved its ruling. The following day, the Estate moved for contempt and sanctions against PSP. The defendants opposed the motion and again asked the court to reconsider its ruling on the autopsy photographs.[19]

---

[19] In its opposition to contempt and sanctions, PSP mentioned Dr. Loeser's testimony for the first time in support of its argument regarding the autopsy photographs. PSP claimed that at his first deposition in November 2011, Dr. Loeser testified that there was a rupture of Skinner's old acoustic neuroma site, that bacteria broke through from that site as a result of barometric pressure change on Skinner's flight to Seattle, and this caused bacterial meningitis. According to PSP, "The only issue had been when this happened, and what caused it." Then, given Dr. Riedo's testimony, PSP claimed that the Estate realized its theory of the case was in jeopardy because "Dr. Loeser agreed with Dr. Riedo as to the source of the infection (the site of the neuroma removed during the D.C. surgery in 2006)" and "Dr. Cummins was in virtual agreement with Dr. Riedo as to the existence of this abscess-like formation."
According to PSP, the Estate then informed PSP that Dr. Loeser had new opinions and would submit to a second deposition to discuss those new opinions. PSP claims that at the second deposition in December 2011, "Dr. Loeser now testified that he had 'concerns' about the idea of attributing bacteria from the old surgical site as the source of the infection (based upon supposed inconsistencies he had just discovered between the autopsy report and the second surgery report), and that instead, Ms. Skinner had a 'smoldering' infection in her middle ear, which 'leaked' but had not 'ruptured or broke.'" Thus, according to PSP, "Dr. Loeser, in response to Dr. Riedo's testimony, changed his opinion to a 'smoldering infection in the middle ear' as opposed to an infection located in the old surgical site, and claimed that this 'smoldering infection' leaked into Ms. Skinner's brain, as opposed to having the pus and bacteria at the former surgical site rupturing/breaking into the brain, as posited by Dr. Riedo (and even, to a degree, by Dr. Cummins)." PSP argued, "Thus, not until the late morning of December 5, 2011, when Dr. Loeser effectively created a sea change in plaintiff's causation theory of the case, did PSP have reason to believe that the autopsy photographs could be crucial to the resolution of the causation issue. If there was even a lingering doubt at that point, the significance and the necessity was driven home by plaintiff's decision, announced for the first time on December 9, 2011, to withdraw Dr. Cummins."

On December 27, the court heard oral argument on the contempt motion.

The Estate asked the court to exclude Dr. Riedo's testimony entirely as a sanction.

PSP argued that assuming the court was unwilling to reconsider the autopsy

photographs issue, the appropriate remedy was to redact the references to the

photographs in the autopsy report, not to exclude Dr. Riedo's testimony. PSP claimed

that Dr. Riedo's testimony was fully developed at the time of his deposition in November

2011, and PSP affirmed that Dr. Riedo could testify without relying on the photographs.

PSP commented further regarding the photographs:

> The photos were not necessary to [Dr. Riedo's] formation of his opinion.
> The photos are necessary to - - if they're necessary at all, they are
> necessary to kind of give the jury some help with regard to the cross-examination
> of plaintiffs' experts, direct examination of defense experts, to settle the
> controversy between [Loeser's second deposition and Riedo's deposition]."
> That's really at the crux of this. The photos can do that.
> They are not necessary for Dr. Riedo's opinion because . . . I think in his
> declaration that we filed the previous week, he said: My opinion was definite, the
> photos were even - - were simply corroborative of what my opinion had been. So
> he doesn't - - he's not polluted. He's not going to make reference to the photos if
> that is the court's order. He doesn't need to be stricken as a witness.

RP (Dec. 27, 2011) at 980 (emphasis added).

The court reasoned:

> The only question before me this morning is whether counsel for PSP
> disobeyed an evidentiary ruling by asking Dr. Talan questions about the excluded
> autopsy photos in front of the jury. If the only question that had been asked was
> would a picture be helpful, or a photograph be helpful, that might be one thing.
> But that is not what my notes reflect what was asked. What was asked
> was "Did you look at the autopsy photos?," and "Would it have been helpful to
> have looked at those autopsy photos?," clearly trying to set up the credibility
> argument for down the road.

RP (Dec. 27, 2011) at 984-85. The court found that PSP violated the order requiring the

parties to obtain the court's permission before questioning witnesses about excluded

evidence in the jury's presence. The court refused to exclude Dr. Riedo's testimony, finding that an inappropriate sanction. But the court did exclude the photographs and any further testimony regarding them. The court explained:

> After having reviewed the autopsy report itself and the narrative of that, the report is very detailed as to what the findings were. It's clear to the court that given that none of the experts requested to see the photographs, they must have concluded that the narrative in the autopsy report was sufficient for them to form their opinions, and that's what is - - their opinions will be limited to.

RP (Dec. 27, 2011) at 986. The court also granted the Estate's request to redact any reference to the photographs from the autopsy report.

In February 2012, PSP renewed the autopsy photographs issue in its motion for new trial following the verdict and entry of judgment. It argued that it established good cause for not designating the autopsy photographs by the discovery deadline and argued that the photographs "are a uniquely powerful confirmation that what Dr. Anderton confronted on January 26, 2010, was not a classic case of bacterial meningitis but—unbeknownst to her and her patient, Ms. Skinner—a rapidly unfolding medical catastrophe, beyond the ability of any competent medical professional to remedy." PSP claimed the photographs became even more relevant due to Dr. Loeser's rebuttal testimony at trial, in which Dr. Loeser stated that the debris seen near Skinner's old surgery site "could have been the remnants of the fat graft, and the collagen and Dura[G]en, and things packed in there" during the surgery. In a footnote, PSP claimed that the trial court, in excluding the photographs, had failed to take into account Burnet and Blair.

-30-

In a supplemental memorandum supporting its motion for new trial, PSP also submitted a declaration from a juror claiming that he would have voted "no" on causation if he had seen the autopsy photographs at trial.

PSP also submitted a supplemental declaration by Dr. Riedo. Dr. Riedo disputed Dr. Loeser's trial testimony suggestion that the autopsy report's reference to "purulent material" could have been "the remnants of the fat graft, and the collagen and the Dura[G]en, and things that were packed in there." (Jan. 3, 2011) at 1671. Dr. Riedo claimed that the autopsy photographs "support Dr. Cummins' theory, and mine, that a catastrophic rupture had occurred, as opposed to the theory that Ms. Skinner suffered a slow and building leak of bacteria into her cerebral spinal fluid, with effects that could have been arrested by introduction of antibiotics and possibly steroids." Dr. Riedo stated that the photographs confirmed the presence of a "large pocket – what I referred to as an abscess-like formation" and that Skinner's temporary relief was caused by rupture of this abscess-like formation. Dr. Riedo described for the first time how two particular photographs showed "reservoirs of pus" near Skinner's prior acoustic neuroma surgery site, thus confirming that the autopsy report was referring to pus when it used the term "purulent." Dr. Riedo stated that despite the semantic distinctions made at trial,

> Dr. Loeser was in essential agreement that Ms. Skinner was afflicted by the intrusion of the collection of pus and bacteria that had formed in the former surgical site. <u>The real area of disagreement, then, was whether this intrusion from this site into the meninges was slow, building up over days but still subject to reversal in the late morning of January 26, 2010, or whether what was later found at autopsy was the result of a more sudden, catastrophic event that sealed Ms. Skinner's fate.</u>

(Emphasis added.)

-31-

On February 14, 2012, the trial court denied PSP's motion for new trial. The court restated the reasons it had given during trial and concluded:

> Nothing presented by Defendants at this time convinces the Court that it abused its discretion in excluding the photographs or excluding testimony from Dr. Riedo regarding those photographs. There was little disagreement between Dr. Riedo and Dr. Loeser regarding what the pathologist found during the autopsy. In fact, Dr. Loeser on cross examination conceded that the collection of pus, whether called an abscess-like collection or an empyema, "broke open" or "ruptured" as a result of a flight Ms. Skinner took. The crux of the dispute between Plaintiff's experts and defense experts was not whether pus migrated from an old surgical site into Ms. Skinner's brain. The dispute was over the issue of when this infiltration of pus occurred and how rapidly it occurred. None of the expert declarations submitted by PSP demonstrate how any of the autopsy photographs definitively answers this question. Dr. Riedo, in the supplemental declaration submitted with the motion for a new trial, says the photos corroborate his opinion that there was a "large pocket" in Ms. Skinner's brain. But this fact was undisputed. All of the experts agreed that Ms. Skinner had a void left by the acoustic neuroma surgery. He also states that they show a "residual collection of pus in this site." Again, this was not disputed by any expert and was clearly disclosed in the autopsy report—a fact brought out by defense counsel during cross examination and closing argument.

On February 21, 2012, the court issued a supplemental order addressing

> one issue raised by Defendants in a footnote of their motion [for new trial]— whether the Court had articulated, on the record, the Court's consideration of a lesser sanction, the willfulness of the discovery violation, and any prejudice arising from the violation under Blair v. Ta-Seattle East No. 176, 171 Wn.2d 342, 254 P.3d 797 (2011) before initially excluding the autopsy photographs.

In its supplemental order, the court, although it "believe[d] it put its Blair analysis on the record," analyzed the Burnet/Blair factors and concluded (1) lesser sanctions were inappropriate, (2) the discovery violation was "willful in the sense that the Defendants had not shown good cause for their failure to disclose the autopsy photographs during discovery," and (3) allowing the photographs would have unduly prejudiced the plaintiff.

In March 2012, PSP filed a "supplemental motion for new trial" arguing that the court's after-the-fact analysis was insufficient under Burnet and Blair. The court summarily denied that motion.

### Analysis

As discussed above, the trial court gave several reasons for excluding the autopsy photographs. The defendants contend that (1) the court failed to comply with Burnet and Blair's requirements for findings on the record, (2) KCLR 4(j) cannot trump the Burnet/Blair line of cases, (3) ER 403 provides no support for the court's ruling, and (4) the court's later sanction for violating the motion in limine cannot support its initial exclusion order.

### Applicability of the Burnet Requirements

The defendants claim the trial court abused its discretion by failing to make Burnet findings on the record at the time it excluded the autopsy photographs. The Estate counters that Burnet does not apply in this case, and even if it does, the record shows the court considered the Burnet factors.

In this case, the order setting civil case schedule provided that the trial court "may" impose sanctions set forth in KCLR 4(g) and CR 37 for failure to comply with the order. KCLR 4(g) provides:

> (1) Failure to comply with the Case Schedule may be grounds for imposition of sanctions, including dismissal, or terms.
> (2) The Court, on its own initiative or on motion of a party, may order an attorney or party to show cause why sanctions or terms should not be imposed for failure to comply with the Case Schedule established by these rules.
> (3) If the Court finds that an attorney or party has failed to comply with the Case Schedule and has no reasonable excuse, the Court may order the attorney or party to pay monetary sanctions to the Court, or terms to any other

-33-

party who has incurred expense as a result of the failure to comply, or both; in addition, the Court may impose such other sanctions as justice requires.

(4) As used with respect to the Case Schedule, "terms" means costs, attorney fees, and other expenses incurred or to be incurred as a result of the failure to comply; the term "monetary sanctions" means a financial penalty payable to the Court; the term "other sanctions" includes but is not limited to the exclusion of evidence.

(Emphasis added). CR 37(b)(2) sets forth sanctions a court may impose for failure to comply with a court order and provides in relevant part:

(2) Sanctions by Court in Which Action is Pending. If a party . . . fails to obey an order . . . made under section (a) [Order to Compel] of this rule . . . the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following:

. . . .

(B) An order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting him from introducing designated matters in evidence;

(C) An order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action or proceedings or any part thereof, or rendering a judgment by default against the disobedient party.

Under well settled Washington Supreme Court authority, when a trial court imposes one of the harsher remedies for a discovery violation—such as dismissal, default, or exclusion of testimony—the court must make findings that show the court's consideration of lesser sanctions, willfulness, and substantial prejudice. Burnet, 131 Wn.2d at 494; Mayer v. Sto Indus., Inc., 156 Wn.2d 677, 687-88, 132 P.3d 115 (2006). Burnet involved a plaintiff's medical malpractice suit against a hospital and a treating physician. Burnet, 131 Wn.2d at 487. The complaint alleged negligence, breach of contract, informed consent, and Consumer Protection Act violations. Burnet, 131 Wn.2d at 488. The trial court removed the plaintiffs' "negligent credentialing" claim against the hospital when the plaintiffs failed to disclose that their experts would testify

-34-

as to that issue, ruling that "'no claim of corporate negligence regarding credentialing is at issue in this litigation and there shall be no further discovery from [the hospital] on that issue.'" Burnet, 131 Wn.2d at 491. The Court of Appeals affirmed on the basis that limiting discovery and precluding testimony on the negligent credentialing claim was an appropriate sanction for failure to comply with the discovery scheduling order. Burnet, 131 Wn.2d at 491.

Our Supreme Court reversed. It treated the trial court's action as a sanction under CR 37(b)(2). Burnet, 131 Wn.2d at 493-94. It stated the general rule that trial courts have broad discretion in the choice of sanctions for violation of discovery orders but noted that the reasons for such sanctions "should, typically, be clearly stated on the record so that meaningful review can be had on appeal." Burnet, 131 Wn.2d at 494. The court held:

> When the trial court 'chooses one of the harsher remedies allowable under CR 37(b), . . . it must be apparent from the record that the trial court explicitly considered whether a lesser sanction would probably have sufficed,' and whether it found that the disobedient party's refusal to obey a discovery order was willful or deliberate and substantially prejudiced the opponent's ability to prepare for trial.

Burnet, 131 Wn.2d at 494 (quoting Snedigar v. Hodderson, 53 Wn. App. 476, 487, 768 P.2d 1 (1989), rev'd in part on other grounds, 114 Wn.2d 153 (1990)). The court found significant that "the trial court not only limited the Burnets' discovery on the credentialing issue, but it also removed that issue from the case." Burnet, 131 Wn.2d at 498. Because the trial court failed to find that the Burnets willfully violated a discovery order and failed to consider less severe sanctions, it abused its discretion in imposing this "severe sanction." Burnet, 131 Wn.2d at 497-98.

In Mayer, the court addressed when Burnet requirements are applicable. Mayer involved the question of whether "the trial court abuse[d] its discretion in awarding monetary compensatory discovery sanctions without following the procedures set forth in Burnet . . . ." Mayer, 156 Wn.2d at 683. In delimiting Burnet's application, the court noted, "Because the Mayers' sanctions motion was brought under CR 26(g), the Burnet test, which is applicable to 'the harsher remedies allowable under CR 37(b),' should have no applicability." Mayer, 156 Wn.2d at 689 (quoting Burnet, 131 Wn.2d at 494) (internal citations omitted). It reversed the court of appeals and held:

> In sum, the case law that the Burnet court relied on established that, before a trial court may impose a CR 37(b)(2)(B) sanction excluding testimony, a showing of willfulness was required; that, for "one of the harsher remedies allowable under CR 37(b)," the record must clearly state the reasons for the sanction; and that, for the "most severe" CR 37(b)(2)(C) sanction of dismissal or default, the record must show three things—the trial court's consideration of a lesser sanction, the willfulness of the violation, and substantial prejudice arising from it. However, by elliptically quoting the three-part test of Snedigar, the Burnet court extended the test beyond the "most severe" sanctions of dismissal or withdrawal to encompass "the harsher remedies allowable under CR 37(b)"—a phrase that, at a minimum, means a CR 37(b)(2)(B) sanction excluding testimony but that, more broadly, encompasses any and all of the sanctions described in CR 37(b)(2)(A)-(E). However, nothing in Burnet suggests that trial courts must go through the Burnet factors every time they impose sanctions for discovery abuses. Nor does Burnet indicate that a monetary compensatory award should be treated as "'one of the harsher remedies allowable under CR 37(b).'" 131 Wn.2d at 494, 933 P.2d 1036 (quoting Snedigar, 53 Wash.App. at 487).
>
> . . . .
>
> . . . [T]he reference in Burnet to the "'harsher penalties allowable under CR 37(b)'" applies to such remedies as dismissal, default, and the exclusion of testimony—sanctions that affect a party's ability to present its case—but does not encompass monetary compensatory sanctions under CR 26(g) or CR 37(b)(2).

Mayer, 156 Wn.2d at 688–90 (emphasis added).

In Blair, our Supreme Court addressed whether a trial court abused its discretion in excluding witnesses as a sanction for discovery violations without noting its reasons

on the record. In Blair, the plaintiff failed to timely disclose witnesses under the case schedule. Blair, 171 Wn.2d at 345-46. When the plaintiff finally disclosed her witnesses, the defendant filed a motion to strike the entire witness list. Blair, 171 Wn.2d at 345. The trial court entered an order (the August 14 order) allowing the plaintiff to select only 7 of the 14 listed witnesses to call at trial but entered no findings supporting the order. Blair, 171 Wn.2d at 346. The trial court later struck two additional witnesses as a sanction for violating the earlier order (the October 15 order). Blair, 171 Wn.2d at 347. Before trial, the court granted the defendant's motion for summary judgment dismissal. Blair, 171 Wn.2d at 347.

On appeal, the plaintiff argued that the trial court's orders excluding her witnesses were improper on the ground that the record did not reflect the trial court's consideration of the Burnet factors. Blair, 171 Wn.2d at 348. Our Supreme Court agreed and reversed. It noted, "[W]hen imposing a severe sanction such as witness exclusion, 'the record must show three things—the trial court's consideration of a lesser sanction, the willfulness of the violation, and substantial prejudice arising from it.'" Blair, 171 Wn.2d at 348 (quoting Mayer, 156 Wn.2d at 688). Blair reiterated its rule in Mayer: "This Court in Mayer stated, '[We] . . . hold that the reference in Burnet to the harsher remedies allowable under CR 37(b) applies to such remedies as dismissal, default, and the exclusion of testimony—sanctions that affect a party's ability to present its case— but does not encompass monetary compensatory sanctions.'" Blair, 171 Wn.2d at 348 (quoting Mayer, 156 Wn.2d at 690) (internal quotation marks omitted). Blair continued, "But Mayer clearly held that trial courts do not have to utilize Burnet when imposing lesser sanctions, such as monetary sanctions, but must consider its factors before

-37-

imposing a harsh sanction such as witness exclusion." Blair, 171 Wn.2d at 349. The court concluded, "Neither of the trial court's orders striking Blair's witnesses contained any findings as to willfulness, prejudice, or consideration of lesser sanctions, nor does the record reflect these factors were considered." Blair, 171 Wn.2d at 348 (emphasis added). The court rejected the defendant's attempt to use the October 15 order to "backfill" the August 14 order: "'The August 14 order needed to be supportable at the time it was entered, not in hindsight by reference to the October 15 order. . . . [T]he August 14 order needed to set forth findings under Burnet independent of the later-entered October 15 order." Blair, 171 Wn.2d at 350.

In Teter v. Deck, 174 Wn.2d 207, 274 P.3d 336 (2012), our Supreme Court held that striking a plaintiff's expert witness as a discovery sanction was an abuse of discretion where the trial court's order contained no finding that the plaintiff's discovery violation was willful or that the court explicitly considered lesser sanctions. Teter, 174 Wn.2d at 218-22. The court explained, "A trial court may make the Burnet findings on the record orally or in writing. . . . Thus, where an order excluding a witness is entered without oral argument or a colloquy on the record, findings on the Burnet factors must be made in the order itself or in some contemporaneous recorded finding." Teter, 174 Wn.2d at 217. The court also rejected the defendant's argument that the record plainly reflected the trial court's consideration of the Burnet factors. Teter, 174 Wn.2d at 218-19. Specifically, the Teter court noted that the trial court "made no reference to [the plaintiff's] explanation [for the discovery violations] and did not explicitly reject it." Teter, 174 Wn.2d at 219. The court also noted, "Mere issuance of lesser sanctions during the discovery process cannot substitute for on-the-record consideration of lesser sanctions

when excluding a witness." Teter, 174 Wn.2d at 219. The Teter court emphasized that the case at hand was factually similar to Burnet:

> This case is more like Burnet—in both Burnet and here the sanction order forced plaintiffs to abandon one of their claims. In Burnet, plaintiffs were precluded from bringing negligent credentialing claims by an order limiting discovery on the issue, while here the Teters were forced to abandon an informed consent claim due to exclusion of Dr. Fairchild.

Teter, 174 Wn.2d at 221 (citation omitted). Thus, the sanction's severity was critical in the court's analysis.

We conclude the Burnet factors do not apply under the facts of this case for the reasons that follow.

PSP claimed the autopsy photographs became relevant only after the Estate withdrew Dr. Cummins, an expert causation witness it relied on to support its causation theory at trial, and instead substituted Dr. Siegel who offered equivocal causation opinions.[20] In PSP's two offers of proof[21] discussed above, Dr. Riedo testified that he relied on Dr. Cummins' testimony to support his "rupture" theory and "therefore had no reason to think that the autopsy photos were essential to my review." This assertion mistakenly assumes Dr. Cummins' testimony supports his causation theory. He also claimed that the photographs corroborated his rupture theory and the presence of a "large pocket" or "abscess-like formation." As the trial court correctly observed, the crux of the dispute was over timing—when and how quickly the infection spread. Read in

---

[20] We agree with the trial court's conclusion that PSP unjustifiably relied on Dr. Cummins' testimony to establish, in part, the defense case. The course of trial is by its very nature frequently unpredictable and fluid. To rely on an opponent's expert witness to make one's case at trial is at best a risky proposition.

[21] The second offer of proof was filed after the verdict in a motion for new trial.

complete context, it is evident Dr. Riedo used the term "rupture" to describe a sudden release. He compared this phenomenon to a "pimple" and other conditions such as a ruptured appendix. The offers of proof gave no specifics as to why the photographs uniquely supported his rupture theory. The photographs depicted nothing related to the crucial timing issue.

Our review of the record also shows Dr. Cummins provided no support for PSP's rupture theory, which it asserted to explain Skinner's improvement and then rapid decline after her visit with Dr. Anderton. All the experts agreed on the old surgical site as the source of the infection and used synonymous terms in describing it. PSP asked Dr. Cummins if he thought Skinner had an abscess in her old surgical site on her first visit to the ER on January 25. Dr. Cummins answered, "I do." Dr. Cummins said he could not explain why Skinner felt better after seeing Dr. Anderton but that fact did not change his opinion that Skinner "had bacterial meningitis there when Dr. Anderton was seeing her." He elaborated:

> There's absolutely no doubt or disputing that she had acute bacterial meningitis during that time [period between Dr. Anderton visit and return to ER with Dr. McCreadie] and it was just getting steadily worse. These little islands of normal behavior are not possibly going to trump what we know was going on from the time she had her MRI, which showed meningitis, when she came back to Dr. McCreadie in acute fulminant meningitis infection.

PSP then attempted to pin him down on its rupture theory:

> Q. Okay. Could all of these factors be explained by Mrs. Skinner having a walled-off area of bacterial infection in that surgical site, then rupture or opening of that surgical site, drainage of the infection, so that that would give her some pain relief for a temporary period of time?
> MR. WAMPOLD: Object to the form.
> A. I think when she - - I think that's what - - you are exactly right. You described what I think was going on when she saw Dr. Trione.
> Q. Okay.

A. And this, what you are speculating about, did she have a walled-off abscess and then it got ruptured?

Q. Um-hum.

A. That would certainly move the infection into a much more accelerated phase.

Q. Um-hum.

A. And is your question specifically would that have temporarily relieved her pain?

Q. Yes.

A. No.

Q. You don't think so?

A. No.

Q. Okay. But you think that she had a walled-off abscess that then ruptured and started draining the infection; is that correct?

MR. WAMPOLD: I'm going to object to form.

Go ahead.

A. I think her appearance with Dr. Trione, I think the . . . CT scan that was obtained when she came to see Dr. McCreadie . . . would have been virtually the same if Dr. Trione had gotten a CT scan.

Q. Okay.

A. And then the dramatic gorilla in this picture is the MRI, showing that she had diffuse meningitis, inflammation, and enhancement.

PSP asked Dr. Cummins to clarify his answer to its prior "rupture or opening" question:[22]

Q. All right. I'm just trying to understand now why earlier you said that you thought that it was exactly correct that when she saw Dr. Trione, she had this walled-off abscess, which then ruptured.

MR. WAMPOLD: I'm going [to] object to the form.

Go ahead.

A. The problem I'm having is with agreeing with just this term rupture.

Q. Okay. Can you fix it?

A. Well, I think that it was not diffusely spread [means widely spread] when she saw Dr. Trione. I think the abscess as documented in the CT scan was there . . . and would have been detected by a CT scan if Dr. Trione had ordered it.

---

[22] Indeed, the form of the disjunctive question created ambiguity in Dr. Cummins' answer. Whether Dr. Cummins was agreeing with "rupture" or "opening," or both, was unclear until PSP asked him to clarify his prior response.

This testimony makes clear that Dr. Cummins rejected Dr. Riedo's rupture theory. Dr. Cummins also disagreed that Skinner's prior lumbar puncture caused her meningeal enhancement on the MRI results. As did all the experts, Dr. Riedo reviewed the autopsy reports, the depositions, and other materials provided by counsel. Thus, it was no surprise to Dr. Riedo that the rupture theory would be a hotly contested trial issue. None of the experts relied on the autopsy photographs even though Dr. Riedo testified "four to six of them" were "crucial to a determination of the cause of Ms. Skinner's death . . . ."[23] Presumably, these experts were all aware of the photographs' existence because they are prominently mentioned on page 1 of the Overlake Hospital autopsy report.

As to PSP's claim that Dr. Siegel gave three possible sources for the infection, the record evidence summarized above shows that he ultimately agreed with Dr. Loeser's opinion that the infection started in the old surgical site. Dr. Riedo's offers of proof and counsel's argument alleged that the photographs uniquely supported defendants' rupture theory. Contrary to this assertion, it was Dr. Wohns' testimony discussed above and the autopsy reports that arguably supported Dr. Riedo's causation theory. The record evidence shows that Dr. Riedo's testimony relied on the autopsy reports to corroborate and support his rupture theory:

> Q. Okay. Now, is this purulent collection in the same place that you're calling the formation of an abscess?
> A. Correct.
> Q. Are you and the Overlake pathologist talking about the same finding here [referring to the Overlake autopsy report]?

---

[23] We note, as did the trial court, that Dr. Riedo chose not to evaluate the significance of the autopsy photographs during his medical records review.

A. Correct. This is her surgical site. This is the site where this infection started, incubated and ultimately spread into her brain.

Q. The Overlake pathologist also removed some of the temporal bone at that area and attempted to visualize the underlying anatomy. Is that what is described in this discussion here?

A. Yes.

Q. And [the Overlake autopsy report] concludes by saying the normal expected anatomy is not visualized, and it is obscured by a collection of pus?

A. That's correct.

. . . .

Q. Did they send this portion of Ms. Skinner's anatomy, the back of the inner ear, the old acoustic neuroma site to Johns Hopkins for analysis?

A. No, only the brain was sent.

. . . .

Q. Was there the spread of pus and bacteria from that, whether we call it a purulent collection, an abscess or a collection of pus and bacteria into the brain?

A. Yes. I think that [purulent collection] was the original source of the infection. I don't think this started as a pneumonia, which then spread through the bloodstream.

I think this was the original source of the infection that then perforated, ruptured, broke through into the meningeal space and produced this result.

Q. And are these the findings that Johns Hopkins made related to that rupture of pus and bacteria into the brain?

A. Yes.

RP (Dec. 29, 2011) at 1472-73 (emphasis added).

Given the record here, we cannot agree that the autopsy photographs were "crucial" and became relevant only after the Estate withdrew Dr. Cummins and substituted Dr. Siegel. We conclude that the autopsy photographs were not only cumulative of other evidence[24] but also irrelevant[25] as the trial court properly ruled.

---

[24] Under ER 403, even relevant evidence may be excluded if its probative value is substantially outweighed by considerations of "needless presentation of cumulative evidence," among other grounds. We may affirm on any ground supported by the record. Deep Water Brewing, LLC v. Fairway Res., Ltd., 170 Wn. App. 1, 11, 282 P.3d 146 (2012).

We also conclude that the trial court's ruling to exclude the photographs under the circumstances here does not implicate the Burnet factors. PSP cites no authority holding that exclusion of irrelevant evidence triggers a Burnet analysis. This case involved none of the harsher sanctions—dismissal, default, witness or testimony exclusion—discussed in Burnet, Mayer, Blair, and Teter. None of these cases hold that the exclusion of any testimony requires the court to apply Burnet factors. Indeed, as Mayer explained, only the harsher sanctions that affect a party's ability to present its case such as dismissal, default, and exclusion of witnesses or testimony require Burnet scrutiny.

PSP had a complete and fair opportunity to present its theory of causation through its expert witnesses and numerous illustrative and substantive exhibits[26] admitted at trial.[27] This evidence allowed PSP to argue its causation theory to the jury as the summary of closing argument quoted above demonstrates. The trial court acted well within its discretion in excluding the autopsy photographs.[28]

---

[25] ER 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

[26] In excluding the photographs, the trial court told PSP that it was free to use alternative means such as diagrams and illustrations to support Dr. Riedo's testimony. Indeed, PSP used exhibit 138A through Dr. Wohns and the autopsy reports through Dr. Riedo to make its causation point.

[27] Both parties capitalized on the frequent use of diagrams, illustrations, preeminent medical treatises and articles, and imaging studies to make their points.

[28] Given our disposition, we need not address the broader question of whether KCLR 4 implicates the Burnet factors.

ER 403

As discussed above, the trial court alternatively concluded that the autopsy photographs were inadmissible under ER 403. The defendants challenge this ruling, arguing that (1) the court failed to properly balance probative value against unfair prejudice because it admitted it did not know whether the photographs were probative,[29] (2) the court ignored the defendants' subsequent offer of proof,[30] (3) the court erred in "presuming to balance probative value against unfair prejudice under ER 403 before the introduction of evidence had begun,"[31] and (4) "the Estate had no standing to raise the

---

[29] The trial court can hardly be faulted for this alleged failing since PSP had not yet made its offer of proof about the relevance of the autopsy photographs. The offer of proof allows the trial court to properly exercise its discretion when reviewing, reevaluating, and revising its rulings if necessary. State v. Ray, 116 Wn.2d 531, 538-539, 806 P.2d 1220 (1991). "An offer of proof must be sufficiently definite and comprehensive fairly to advise the trial court whether or not the proposed evidence is admissible. An additional purpose of such an offer of proof is to inform the appellate court whether appellant was prejudiced by the exclusion of the evidence." Sutton v. Mathews, 41 Wn.2d 64, 67, 247 P.2d 556 (1952) (citation omitted). If the party fails to aid the trial court, then the appellate court will not make assumptions in favor of the rejected offer. Smith v. Seibly, 72 Wn.2d 16, 18, 431 P.2d 719 (1967).

[30] We question this contention, as the record shows PSP failed to submit an offer of proof identifying the specific photographs it wanted admitted and explaining how they were relevant until it moved for a new trial in February 2012. See Clerk's Papers at 1061-68 (supplemental declaration by Dr. Riedo). As discussed above, Dr. Riedo's initial declaration, submitted in December 2011, two days after the court's initial ER 403 ruling, did not identify which photographs the defendants were seeking to admit.

[31] PSP never raised this ground below. See RAP 2.5(a); Roberson v. Perez, 156 Wn.2d 33, 39, 123 P.3d 844 (2005) ("An appellate court 'may refuse to review any claim of error which was not raised in the trial court.'") (quoting RAP 2.5). We also note that PSP cites no controlling authority that a trial court errs if it makes an ER 403 ruling before the introduction of evidence. As the record indicates, the trial court reviewed 16 color autopsy photographs and the deposition testimony of defense experts Drs. Maravilla, Wohns, and Riedo, and reviewed the defense motion for reconsideration and the Estate's memorandum in opposition before its ER 403 ruling. At this point, PSP

issue because it could not be prejudiced by any 'inflammatory' effect."[32] Appellant's Br. at 42, 43 (emphasis in original).

Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. ER 403. Federal law, state law, and commentators agree that "'unfair prejudice'" results from evidence which is dragged in for its prejudicial effect or is likely to evoke an emotional response rather than a rational decision. Carson v. Fine, 123 Wn.2d 206, 223, 867 P.2d 610 (1994) (quoting U.S. v. Roark, 753 F.2d 991, 994 (11th Cir. 1985)). Evidence may be unfairly prejudicial under ER 403 if it appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish, or triggers other mainsprings of human action. Carson, 123 Wn.2d at 223.

Because of the trial court's considerable discretion in administering ER 403, reversible error occurs only in the exceptional circumstance of manifest abuse of discretion. Carson, 123 Wn.2d at 226; State v. Gould, 58 Wn. App. 175, 180, 791 P.2d 569 (1990); State v. Gatalski, 40 Wn. App. 601, 610, 699 P.2d 804 (1985). Abuse of discretion occurs if the decision is manifestly unreasonable or based on untenable grounds or reasons. Mayer, 156 Wn.2d at 684. "While a balancing of probative value versus prejudicial effect on the record is helpful, it is not essential." Carson, 123 Wn.2d

---

still had not provided an offer of proof as to the relevance of the photographs. Nevertheless, the court assumed relevance as a foundation for its 403 ruling.

[32] PSP cites no controlling authority for its lack of standing assertion. The purpose of ER 403 is to exclude even relevant evidence if its relevance is outweighed by its negative effect on the fact-finding process.

at 226. Our review of the record as discussed above shows that the autopsy photograph evidence was not probative of the rupture causation theory in this case.[33] The color autopsy photographs of the area near Skinner's brain are undeniably gruesome. While Dr. Riedo claims that selecting certain autopsy photographs could "avoid disturbing images," the color autopsy photographs—regardless of which ones are selected—are no less gruesome and disturbing.[34] Under the circumstances of this case, we find no manifest abuse of the trial court's discretion.

---

[33] During the December 27, 2011 hearing on the Estate's motion for contempt, PSP's counsel conceded that the photographs were not necessary to Dr. Riedo's testimony or his ability to express his conclusion. Further, Dr. Riedo testified at trial that as an infectious disease doctor, he did not have the training or experience possessed by surgeons or forensic pathologists who regularly observe the inside of a person's body. Dr. Riedo also acknowledged that both the Overlake and the Johns Hopkins autopsies concluded that Skinner died of bacterial meningitis and neither mentioned a ruptured abscess.

[34] PSP cites Washburn v. Beatt Equipment Co., 120 Wn.2d 246, 840 P.2d 860 (1992), and Mason v. Bon Marche Corp., 64 Wn.2d 177, 390 P.2d 997 (1964), for the proposition that a photograph's gruesomeness or unpleasantness does not necessarily make it inadmissible. However, the photographs at issue in both Washburn and Mason were not autopsy photographs. See Washburn, 120 Wn.2d at 281-89 (one set of photographs depicted plaintiff's burn injuries shortly after fire and over the course of treatment, and the other set depicted plaintiff's coworker's burn injuries; court held photographs were highly relevant to plaintiff's damages claim); Mason, 64 Wn.2d at 178 (plaintiff brought action to recover damages for the loss of her hair stemming from hairdresser's alleged negligence; photograph depicted plaintiff's bald head).

We also note that no authority supports the defendants' argument that the Estate lacks standing to object to the autopsy photographs on ER 403 grounds. The defendants' argument that only the defense risked prejudice from admitting the photographs is unsupported and conclusory. See Beal v. City of Seattle, 134 Wn.2d 769, 777 n.2, 954 P.2d 237 (1998) ("The City cites no authority for this proposition and, thus, it is not properly before us.") (citing RAP 10.3(a)(5); Schmidt v. Cornerstone Invs., Inc., 115 Wn.2d 148, 166, 795 P.2d 1143 (1990)). And ER 403 provides many bases for exclusion of evidence other than unfair prejudice, including "confusion of the issues," "misleading the jury," or "considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Although the trial court concluded the

Even assuming error in excluding the autopsy photographs, any error was harmless and, thus, not a basis for reversal. State v. Bourgeois, 133 Wn.2d 389, 403, 945 P.2d 1120 (1997). "'[E]rror is not prejudicial unless, within reasonable probabilities, the outcome of the trial would have been materially affected had the error not occurred.'" Bourgeois, 133 Wn.2d at 403 (quoting State v. Tharp, 96 Wn.2d 591, 599, 637 P.2d 961 (1981)). "The improper admission of evidence constitutes harmless error if the evidence is of minor significance in reference to the overall, overwhelming evidence as a whole." Bourgeois, 133 Wn.2d at 403. Given the record evidence in this case, we find no reasonable possibility that exclusion of the autopsy photographs would have affected the jury's verdict. Consequently, the error, if any, was harmless.

### Sanction for Contempt of Court

The defendants contend, "The power to enforce the court's exclusion ruling cannot save the exclusion ruling itself." Appellant's Br. at 44. Specifically, the defendants argue that (1) "the trial court got its facts wrong" and erroneously relied on its own notes showing that PSP's counsel asked Dr. Talan about "'the' autopsy photos" despite the transcript showing that counsel only asked about autopsy photographs generally, and (2) "by the time the trial court was considering whether to sanction the Defendants for the questions asked of Dr. Talan, it should have become crystal clear to the court that its initial exclusion ruling was wrong." Appellant's Br. at 44-45.

The defendants' argument lacks merit. As discussed above, the trial court did not abuse its discretion in excluding the autopsy photographs and any testimony

---

photographs were "too inflammatory," any of the other ER 403 grounds could also support its ruling. RP (Dec. 20, 2011) at 286.

referring to them. At the motion in limine hearing, the court cautioned the parties,

"[B]efore you elicit any testimony or approach any topic that I have excluded under a

motion in limine in front of the jury I would ask that you bring your - - to my attention

outside the presence of the jury . . . ." RP (Dec. 9, 2011) at 90. The trial court then

excluded the photographs due to late disclosure. Thus, under the court's rulings in

limine, its ruling excluding the photographs necessarily excluded testimony referring to

them unless the parties asked permission outside the jury's presence. Regardless of

whether the trial court correctly concluded that the defendants violated the motion in

limine by referencing autopsy photographs during examination of Dr. Talan, the court's

remedy—excluding the photographs and any testimony referring to them—had exactly

the same effect as the court's prior ruling excluding the photographs for late disclosure.

Given that the court's sanction for violation of the motion in limine was not necessary to

uphold its earlier decision to exclude the photographs, we need not determine whether

the sanction was appropriate here.

### Rebuttal/Surrebuttal Evidence

#### Relevant Facts

The Estate disclosed Dr. Loeser as a rebuttal expert when, several weeks before

trial, the defense substituted Dr. Wohns after it withdrew an earlier disclosed expert. As

noted above, Dr. Loeser was deposed twice—once after Dr. Wohns' deposition and

then again after Dr. Riedo's deposition. After the second deposition on December 5,

2011, the Estate notified the defendants that it intended to call Dr. Loeser as a rebuttal

witness. PSP moved in limine for an order restricting the scope of Dr. Loeser's

testimony and limiting it to the Estate's case in chief, arguing he could not be withheld

-49-

merely to allow the Estate the last word. The Estate's opposition argued in part that since the defense experts' deposition testimony conflicted, which one of these defense theories would be presented at trial was unclear. The trial court denied PSP's motion.

> If you choose to call Dr. Wohns in your case-in-chief, then I am going to allow the plaintiffs to call Loeser in rebuttal if what his opinions are go directly to Dr. Wohns' opinions. If he's being called to say I disagree with a fellow neurosurgeon on A, B, C and D, then I think that's appropriate rebuttal, and I'll allow that.
>
> . . . .
>
> If what [Dr. Loeser is] being called to do is to specifically address the evidence you present in your case-in-chief, they have to wait to see whether you present it . . .; if you do, then if they wish to bring somebody to rebut that evidence, then they can do so.
>
> If you choose not to elicit a particular opinion . . . then if they call Loeser, you could raise it at that time and say, now, wait a minute, we didn't present this, he shouldn't be allowed to testify because there's nothing to rebut at this point.

RP (Dec. 9, 2011) at 74-75. The court disagreed with the defense argument that "the scope of rebuttal is surprise issues that came up that they couldn't anticipate." RP (Dec. 9, 2012) at 76-77. The court also denied PSP's subsequent motion for reconsideration, in which PSP argued that because Dr. Siegel relied on Dr. Loeser's deposition testimony to form his own causation opinion, Dr. Loeser must be called in the Estate's case in chief.

During trial, Drs. Maravilla, Wohns, and Riedo presented conflicting causation theories. See RP (Dec. 27, 2011) at 1137-41, 1177-79 and RP (Dec. 28, 2011) at 1239 (Dr. Maravilla denied a "rupture" and instead described a slow progressive process resulting from a leak of infectious material from the old acoustic neuroma surgery site into the intercranial space); RP (Dec. 29, 2011) at 1421-29 (Dr. Riedo blamed an abscess that suddenly ruptured into the brain to explain Skinner's atypical presentation in the ER—i.e., the temporary relief in her symptoms—followed by her catastrophic

deterioration); RP (Dec. 28, 2011) at 2091 and RP (Dec. 29, 2011) at 2109-10, 2111-18 (Dr. Wohns concluded Skinner died from "pyogenic ventriculitis" that moved so quickly she would have died even if given antibiotics and steroids sooner; Skinner developed an infection including "white blood cells, bacteria and possibly pus" in the area of her old surgical site; he did not know how long the infection had been present; and changing pressure on the airline flight caused her surgical site repair to break down and infectious material to spread into the spinal fluid space and eventually into the ventricles).

During trial, the defendants asked the court to reconsider the rebuttal issue during Dr. Siegel's direct-examination and again during Dr. Riedo's cross-examination. The defendants claimed Dr. Siegel's reliance on Dr. Loeser's opinions and the Estate's cross-examination of Dr. Riedo about Dr. Loeser's opinions compelled the Estate to call Dr. Loeser in its case in chief. Later in the trial, PSP again objected to rebuttal standard of care testimony and requested surrebuttal if the court allowed the rebuttal testimony. Both parties submitted briefing on the issue. PSP argued that because it limited Dr. Riedo's and Dr. Wohns' testimony to causation only, standard of care rebuttal was improper. The Estate responded that PSP elicited standard of care testimony from its causation experts. The court allowed Dr. Loeser to testify on standard of care in response to the defense experts, particularly Dr. Riedo's, standard of care opinions:

> Ultimately, I believe that the plaintiff has the stronger position on this particular issue. I understand rebuttal should be limited to things that are new and not just a repetition of the plaintiff's case in chief, but there seems to be a fairly clear - - well, perhaps not clear - - disagreement on standard of care that I think Loeser is probably going to address in some way.
> I am going to allow Loeser to testify in rebuttal in the plaintiff's case, and I am going to allow him to opine as to the standard of care.

I do think that there was enough in Dr. Riedo's testimony about the atypicality of [Skinner's] presentation that seems to be the guts of where the disagreement is on the experts; whether or not [Skinner] did in fact exhibit enough signs to warrant [a lumbar puncture]. We've got doctors disagreeing on that fundamental issue.

So I am going to allow Dr. Loeser to testify on rebuttal. I am going to allow him to testify on his opinion as to standard of care.

RP (Jan. 3, 2012) at 1568-69. But the court denied PSP's surrebuttal request, explaining, "[T]he defense has had ample opportunity to elicit the opinions from its expert witnesses that sets up this dispute, and I don't believe that there's any need for surrebuttal." RP (Jan. 3, 2012) at 1569.

Based on Skinner's MRI results, elevated white blood cell count, and other clinical signs, Dr. Loeser testified that he believed Skinner had meningitis on January 26 when Dr. Anderton was treating her. He stated that Dr. Anderton failed to meet the standard of care. He testified that the standard of care required Dr. Anderton to perform a lumbar puncture and to promptly initiate antibiotic therapy based on Skinner's history of fever, neck pain, and headache; history of nausea and vomiting, white blood cell count, and MRI results. Dr. Loeser also addressed the issue of Skinner's prior lumbar puncture, stating, "[T]here is absolutely no basis for saying [Skinner's meningeal enhancement seen on the MRI results] was due to a [lumbar puncture] or a [cerebrospinal fluid] leak that she had five years before with no evidence that it was continuing to leak." RP (Jan. 3, 2012) at 1667; see also RP (Jan. 3, 2012) at 1702. Dr. Loeser disagreed with Dr. Riedo's testimony that Skinner had some sort of abscess that ruptured when she was in the ER on January 26. Dr. Loeser defined "abscess" as "a collection of dead white cells - - pus - - surrounded by the body's attempt to isolate that infection, which we call a 'capsule.'" RP (Jan. 3, 2012) at 1669. He said Skinner's

-52-

"infection was occurring in a space that was already created by the [prior acoustic neuroma] surgeons. If you want to argue she had an infection there, it's an empyema. It's not an abscess." RP (Jan. 3, 2012) at 1670. He stated, "[T]he most likely cause of [Skinner's] meningitis was a leak from the empyema in the ear that contaminated the subspinal fluid spaces." RP (Jan. 3, 2012) at 1671. Dr. Loeser later clarified that an "empyema" is an infection in a previously existing space.

Dr. Loeser discussed the autopsy report's conclusion that there was "purulent material in the middle ear" and stated, "The debris seen in that space could be the remnants of the fat graft, and the collagen and the Dura[G]gen, and things that were packed in there." RP (Jan. 3, 2012) at 1671. However, he stated he had no way of disagreeing with the Overlake pathologist's description of the purulent collection at the old repair site. He believed the pressure change during Skinner's flight to Seattle allowed bacteria to get from the infected surgical site into her spinal fluid. He agreed that pus was contained or held at the old acoustic neuroma repair site by bone.

Dr. Loeser also testified that Dr. Riedo's timing theory was wrong, because the meningeal enhancement was already present when Skinner had her MRI (before the time Dr. Riedo proposed the "abscess" ruptured). On Skinner's brief improvement in the ER, Dr. Loeser explained, "the course of somebody with meningitis, particularly early in the meningitis, can be quite fluctuating." RP (Jan. 3, 2012) at 1674; see also RP (Jan. 3, 2012) at 1738. He also testified that different people vary in their responses to narcotics. Dr. Loeser stated that Skinner's ventriculitis late on January 26 when she returned to the ER was not necessarily fatal because "[v]entriculitis is not a uniformly fatal disease for anyone." RP (Jan. 3, 2012) at 1675-76. He stated that a sizable

percentage of people with meningitis also have ventriculitis, and the vast majority of those survive with prompt treatment.

On the defendants' posttrial motions requesting a new trial, the court agreed that "many of [Dr. Loeser's] opinions were cumulative of those previously expressed by Plaintiff experts Drs. Siegel and Talan" and that some of Dr. Loeser's testimony could have been presented during the Estate's case in chief. But the court concluded that these facts alone did not render Dr. Loeser's rebuttal testimony improper:

> This Court finds that the standard of care and causation issues in this case were complicated and evidence that supported standard of care opinions also supported causation conclusions. For example, the Plaintiff's experts testified that Ms. Skinner presented at the Emergency Department with "classic," but early symptoms of bacterial meningitis. Based on their interpretation of the factual record, they concluded not only that Dr. Anderton should have ruled out bacterial meningitis using a lumbar puncture, but also that had she undertaken this simple test, she could have saved Ms. Skinner's life with proper anti-biotic treatment.
>
> Defense experts (both standard of care and causation experts) disagreed as to what the "classic" symptoms of bacterial meningitis are, disagreed as to whether Ms. Skinner in fact had any of these classic symptoms when she presented at the Emergency Department, and disagreed as to whether Ms. Skinner's life could have been saved. The defense experts themselves were not all in agreement on all of these crucial questions. Defense expert Dr. Maravilla concluded that Ms. Skinner had bacterial meningitis when she first presented to the Emergency Department on the morning in question, but defense expert Dr. Riedo opined that Ms. Skinner did not contract meningitis until later that afternoon when an abscess-like collection of pus ruptured through the dura of her brain. A logical inference to draw from Dr. Riedo's causation testimony was that there was no need for Dr. Anderton to perform a lumbar puncture.
>
> In ruling on this issue during trial, the Court relied on excerpts from Dr. Riedo's trial testimony cited in Plaintiff's Response to PSP's Objection to Rebuttal Standard of Care Testimony by Dr. Loeser. The Court found persuasive Plaintiff's argument that this testimony warranted allowing Dr. Loeser to testify about both standard of care and causation on rebuttal to address the conflicts in the defense experts' testimony on both issues. The Court concludes now that its decision to permit Dr. Loeser to testify as a rebuttal witness was not manifestly unreasonable given the complicated nature of the standard of care issues and the way in which the standard of care and causation issues were factually intertwined. The Court also concludes that the decision was not untenable

because Plaintiff presented evidentiary support from trial testimony for the need to call Dr. Loeser as a rebuttal expert.

The court also identified several specific areas of Dr. Loeser's testimony that rebutted defense testimony. The court concluded that even if it should have prohibited Dr. Loeser from repeating the same standard of care opinions that Drs. Siegel and Talan held, "there is no reason to believe that this testimony alone was the reason that 11 jurors found that Dr. Anderton violated the standard of care." The court also concluded that it properly denied the defense's surrebuttal request because the proposed surrebuttal testimony was cumulative or confirmatory of testimony already given or merely contradicted Estate witness testimony.

### Analysis

### Rebuttal Evidence Ruling

The defendants assign error to the trial court's ruling allowing Dr. Loeser to testify on rebuttal. They contend the testimony was merely a repetition of Drs. Siegel and Talan's testimony and constituted a "dramatic final statement" of the Estate's case.

As discussed above, we review decisions regarding rebuttal testimony for abuse of discretion. White, 74 Wn.2d at 394-95. Such abuse occurs only when no reasonable person would take the adopted view. In re Disciplinary Proceeding Against Van Camp, 171 Wn.2d 781, 799, 257 P.3d 599 (2011). Rebuttal testimony may be somewhat cumulative.

> Ascertaining whether the rebuttal evidence is in reply to new matters established by the defense, however, is a difficult matter at times. Frequently true rebuttal evidence will, in some degree, overlap or coalesce with the evidence in chief. Therefore, the question of admissibility of evidence on rebuttal rests largely on the trial court's discretion, and error in denying or allowing it can be predicated only upon a manifest abuse of that discretion.

White, 74 Wn.2d at 395.

The defendants initially contend that the trial court committed "fundamental error" in denying PSP's motion in limine to bar Dr. Loeser as a rebuttal witness, and this error "infected the future course of proceedings on this issue." Appellant's Reply Br. at 21. But whether rebuttal evidence is necessary depends on the testimony elicited at trial. The trial court explicitly discussed this well-settled principle and noted the defendants' right to raise the issue later during trial. See RP (Dec. 9, 2011) at 74-75 ("If you [defendants] choose not to elicit a particular opinion . . . then if [plaintiffs] call Loeser, you could raise it at that time and say, now, wait a minute, we didn't present this, he shouldn't be allowed to testify because there's nothing to rebut at this point."). The court committed no "fundamental error" in denying the pretrial motion to bar rebuttal testimony until the trial evidence established the need.[35]

The defendants also challenge the trial court's decision to allow the rebuttal testimony. But they fail to explain why the trial court's decision was manifestly unreasonable. The court determined to hear from a rebuttal expert regarding the "disagreement on standard of care," RP (Jan. 3, 2012) at 1568, and without a specific explanation of why no reasonable person would take this view, we will not overturn the

---

[35] The defendants focus on the trial court's statement—made when it ruled on PSP's motion in limine—that "[the Estate is] the plaintiff and . . . they get the last word." RP (Dec. 9, 2011) at 72. We view this remark as a comment about the Estate's burden of persuasion and burden of proof at trial. Regardless of what the court meant by this statement, its ruling denying PSP's motion in limine was not error as discussed above. And there is no indication the court repeated this statement in ruling on the issue at trial. The court's extensive discussion both during trial and in its order denying new trial provide substantial support for its proper decision to allow rebuttal evidence as discussed below.

court's decision. See Van Camp, 171 Wn.2d at 799 ("The hearing officer wanted to hear from a rebuttal expert regarding [the reasonableness of] the fee, and without a specific articulation of why no one would think this a reasonable thing to do, we will not overturn her decision [to allow rebuttal testimony].").  The record summarized above supports the trial court's conclusion that defense experts presented conflicting testimony on both causation and standard of care.[36]  In the trial court's view, Dr. Loeser's rebuttal

---

[36] We also find no error in the trial court's conclusion that Dr. Riedo's testimony strayed into the area of standard of care.  Dr. Riedo was disclosed as a causation expert.  However, he testified several times about Skinner's presentation of symptoms in the ER and how this was inconsistent with bacterial meningitis.  See RP (Dec. 29, 2011) at 1419-20 ("Ms. Skinner had a different course [of progression of symptomology], and I think hers was much more of a stepwise progression.  She clearly had an abscess in the surgical site where the acoustic neuroma had been removed, and I think that abscess produced a lot of her neck pain, neck spasm symptoms."); RP (Dec. 29, 2011) at 1421 (explaining that the most likely explanation for the temporary relief in Skinner's symptoms at the ER was a rupture of the abscess into the brain); RP (Dec. 29, 2011) at 1427 (relief in symptomology in the ER was the result of decompression of the abscess); RP (Dec. 29, 2011) at 1431-33 (discussing Skinner's atypical symptoms); RP (Dec. 29, 2011) at 1434 (ruptured abscess explains Skinner's improvement in the ER, lack of fever, and lack of nuchal rigidity); RP (Dec. 29, 2011) at 1437 (rupture of brain abscess is associated with "significant mortality on the range of 70 to 80 percent" and early treatment with antibiotics would not have made a difference in Skinner's case); RP (Dec. 29, 2011) at 1453-54 (discussing Skinner's "dramatic improvement" during her second ER visit); RP (Dec. 29, 2011) at 1470 (opining that Skinner's symptoms were not indicative of classic meningitis but more consistent with a ruptured abscess); RP (Dec. 29, 2011) at 1477-78 (discussing Skinner's nursing chart and why it supported his conclusion that Skinner was feeling better in the ER; opining that this degree of improvement was not likely due to the small amount of pain medication she received); RP (Dec. 29, 2011) at 1490 (opining that Skinner's initial symptoms—fever, headache, neck pain, vomiting, and chills—could be explained by the abscess or infection in the old surgical site); RP (Dec. 29, 2011) at 1493 (Skinner did not present with typical meningitis symptoms during her second visit to the ER); RP (Dec. 29, 2011) at 1501-02 (stating that the "classic triad" of symptoms was not applicable to Skinner given the source of infection and course of progression, and Skinner "did not present with a classic picture of bacterial meningitis); RP (Dec. 29, 2011) at 1510 (opining that "infectious and inflammatory changes" in the old surgical repair site caused Skinner's neck pain/muscle spasm).  This testimony justifies the trial court's concern about the

testimony was proper even though the Estate presented some standard of care and causation evidence in its case in chief. We decline to overturn the trial court's well founded decision, in which it correctly noted that the issues regarding standard of care and causation were complex and intertwined and the defense presented conflicting testimony on those issues. As we explained in State v. Bius, 23 Wn. App. 807, 811, 599 P.2d 16 (1979), "We believe this is one of those difficult areas noted by the court in White where the evidence in chief and rebuttal evidence may have overlapped to some extent. In such a situation we defer to the trial court, as we find no manifest abuse of discretion." See also Hardman v. Younkers, 15 Wn.2d 483, 496, 131 P.2d 177 (1942) (court allowed witness, after cross-examination, to testify on the same subject matter on rebuttal; our Supreme Court affirmed, noting, "Suffice it to say that the question of the precise limits of rebuttal evidence is a matter resting largely in the discretion of the trial court . . . . It is plain that there was no prejudice in this instance; the evidence was, at most, merely cumulative."). We find no abuse in the trial court's exercise of its discretion under these circumstances.

### Surrebuttal Evidence Ruling

As discussed above, we review the trial court's refusal to allow surrebuttal evidence under a manifest abuse of discretion standard. State v. Luvene, 127 Wn.2d 690, 709-10, 903 P.2d 960 (1995). "'Testimony which is merely cumulative or confirmatory or which is merely a contradiction by a party who has already so testified

---

dispute over standard of care precipitated by the experts' differing views regarding Skinner's symptoms during her second visit to the ER.

does not justify surrebuttal as of right.'" Luvene, 127 Wn.2d at 710 (quoting State v. Dupont, 14 Wn. App. 22, 24, 538 P.2d 823 (1975)).

The trial court properly concluded that the proposed surrebuttal evidence was repetitive and cumulative of prior evidence. On January 4, PSP submitted an "offer of proof regarding proposed surrebuttal testimony." The offer stated that if they had been allowed to testify in surrebuttal, both Drs. Wohns and Riedo[37] would have testified that Dr. Anderton met the standard of care as set forth in their depositions. The offer also stated that Dr. Wohns would deny stating that all cases of ventriculitis are fatal and rebut Dr. Loeser's morbidity and mortality opinions and Dr. Loeser's claim that newer literature established that ventriculitis was common in adults. Our review of the trial testimony shows that the proffered surrebuttal evidence reiterates deposition or trial testimony or contradicts Dr. Loeser's testimony. As discussed above, such testimony does not justify surrebuttal as of right. Luvene, 127 Wn.2d at 710; see also Jarstad v. Tacoma Outdoor Recreation, Inc., 10 Wn. App. 551, 561-62, 519 P.2d 278 (1974) (trial court properly "concluded that defendants, during the lengthy part of their case, had ample opportunity to present testimony . . . . [and] pointed out that some of the offered evidence was impeaching in nature and other evidence offered was already before the court.").

Nor does Dr. Loeser's use of the medical term "empyema" for the first time on rebuttal justify calling a defense expert to testify that he was using the term incorrectly. Dr. Loeser used the term to describe an infection in a contained space. As discussed

---

[37] The record indicates Dr. Riedo was unavailable to testify in surrebuttal due to a scheduling conflict.

above, despite the semantic differences (empyema, abscess, abscess-like, collection, etc.), all the experts agreed that such an infection existed at Skinner's surgical repair site. The trial court acted well within its discretion in denying the defense surrebuttal.

## Harmless Error

Even if the court erred in allowing rebuttal testimony and/or denying surrebuttal, the defendants establish no prejudice affecting the outcome of the trial. An error is prejudicial if it affects, or presumptively affects, the outcome of the trial. Thomas v. French, 99 Wn.2d 95, 104, 659 P.2d 1097 (1983). The defendants argue that they were prejudiced because "not only did Dr. Loeser's testimony constitute a 'dramatic final statement' of the Estate's case -- the Estate's counsel then hammered away in closing argument on the contrast between the three experts the Estate presented on standard of care to just one for the Defendants."[38] Appellant's Br. at 49. In both their opening and reply brief, the defendants cite Anfinson v. FedEx Ground Package System, Inc., 174 Wn.2d 851, 281 P.3d 289 (2012), for the proposition that "exploitation of error in closing argument constitutes prejudice entitling a party to a new trial." Appellant's Br. at 49; see also Appellant's Reply Br. at 22-23. Anfinson is inapposite and the defendants mischaracterize its holding. In dealing with harmless error in the misleading jury instruction context, Anfinson holds that where the court gives an incorrect jury

---

[38] Defendants point to nowhere in the record that establishes this affected the jury's verdict. The jury instructions instructed the jury that counsel's argument is not evidence and the case must be decided based on the evidence. The jury is presumed to follow the court's instructions. State v. Stein, 144 Wn.2d 236, 247, 27 P.3d 184 (2001).

instruction on an important issue and counsel actively urges the incorrect statement of the law upon the jury during closing argument, prejudice is established. Anfinson, 174 Wn.2d at 874-77. This is because jurors are presumed to follow the court's instructions and the focus of argument shows the issue was important. We are unpersuaded by the defendants' reliance on Anfinson. The present case involves no challenge to any jury instructions.

Even assuming the court erroneously allowed some cumulative rebuttal testimony here, the defendants fail to explain how this prejudiced them and cite no authority. "[A]dmission of testimony that is otherwise excludable is not prejudicial error where similar testimony was admitted earlier without objection." Ashley v. Hall, 138 Wn.2d 151, 159, 978 P.2d 1055 (1999). And our Supreme Court has held, "The admission of evidence which is merely cumulative is not prejudicial error." State v. Todd, 78 Wn.2d 362, 372, 474 P.2d 542 (1970); see also Hardman, 15 Wn.2d at 496 (our Supreme Court affirmed allowance of cumulative rebuttal testimony, noting, "It is plain that there was no prejudice in this instance; the evidence was, at most, merely cumulative."); Dennis J. Sweeney, An Analysis Of Harmless Error In Washington: A Principled Process, 31 Gonz. L. Rev. 277, 319 (1995-96) (citing cases and noting Washington has a long history of ruling error harmless if the evidence admitted or excluded was merely cumulative). We conclude that any error in allowing rebuttal and precluding surrebuttal was harmless.

## CONCLUSION

The trial court did not abuse its discretion in excluding Skinner's autopsy photographs, allowing the Estate to present Dr. Loeser's rebuttal testimony, or denying surrebuttal testimony. We affirm.

WE CONCUR: